# Staunton

BLUE DIAMOND COAL COMPANY, INCORPORATED v. MARTHA AISTROP, ADMINISTRATRIX OF THE ESTATE OF RANSOM AISTROP, DECEASED.

September 6, 1944.

Record No. 2847.

Present, Campbell, C. J., and Hudgins, Gregory, Eggleston and Spratley, JJ.

The opinion states the case.

*Walter R. Pennington* and *J. L. Camblos*, for the plaintiff in error.

*Fred B. Greear*, for the defendant in error.

EGGLESTON, J., delivered the opinion of the court.

Ransom Aistrop, employed as a coal loader in a mine owned and operated by Blue Diamond Coal Company, Incorporated, in Lee county, Virginia, was found dead at the place of his employment on the afternoon of August 8, 1941. Martha Aistrop, his wife and the administratrix of his estate, filed in the Circuit Court of Lee county a notice of motion for judgment against the Coal Company, seeking to recover damages for the wrongful death of her husband which she claimed was due to the company's negligence in failing to furnish him a reasonably safe place in which to work. Specifically, the alegation was that the decedent's death had been caused by exposure to noxious gases and poisonous fumes which had accumulated in the place where he worked, due to the negligence of the defendant in failing to furnish proper ventilation. It was further alleged that the decedent's death was due to his "continued exposure to said gases and fumes" which caused his "gradual" suffocation and poisoning.

The defendant filed a demurrer to the notice of motion for judgment, alleging, in substance, that by virtue of the provisions of the Workmen's Compensation Act (Acts 1918, ch. 400, p. 637, as amended; Michie's Code of 1942, sec. 1887 (1), et seq.) the lower court was deprived of jurisdiction of the subject-matter of the suit. The demurrer was sustained and the suit dismissed We reversed the judgment (*Aistrop* v. *Blue Diamond Coal Co.*, 181 Va. 287, 24 S. E. (2d) 546) holding that the allegation of the notice of motion for judgment was "broad enough to cover an event which may be actionable at law or one which may be com-

pensable under the provisions of the workmen's compensation law" (181 Va., at page 295, 24 S. E. (2d), at page 549). Consequently, the case was remanded for a trial on the merits. This has resulted in a verdict and judgment in favor of the administratrix, and the case is again before us on a writ of error granted the Coal Company.

The first assignment of error is that the verdict is contrary to the law and evidence and without evidence to support it; that the evidence fails to show that the place to which the decedent had been assigned to work was improperly ventilated, or that poisonous or noxious gases had been allowed to accumulate therein. Moreover, it is said that the evidence fails to show that Aistrop died from poisonous gases, and that it is equally probable that his death was due to natural causes, for which the Coal Company was in no way responsible.

Aistrop was thirty-nine years old and had worked for fifteen years as a coal miner. For the last six years he had been employed by the Blue Diamond Coal Company at this mine. He first worked as a coal loader, his duties requiring him to load into cars loose coal which had been cut or blasted from the seams. Later he was engaged in track laying and other maintenance work. In May, 1941, he was again assigned to work as a coal loader.

In the "latter part" of July, 1941, the exact date of which is not shown on the record, Aistrop was assigned to work alone in a section of the mine known as "No. 4 Room." This "room" consisted of an excavation or tunnel about eighteen feet wide and four feet high along the seam or stratum of coal, and ran at right angles from another tunnel or "aircourse" known as "No. 7 Room." When Aistrop first commenced to work in this room it had been excavated to a depth of from fifteen to twenty-five feet. During the time that he worked there it was projected to a maximum depth of thirty-eight feet.

In the same area similar parallel rooms or tunnels had been projected by other miners and were known, respectively, as

Rooms Nos. 1, 2 and 3. Each of these was likewise worked by a single coal loader.

Ventilation to this area was furnished by means of exhaust fans which forced a current of air through "No. 7 Room." By means of brattices or curtains the current of air passed along the entrances to Rooms Nos. 4, 3, 2 and 1, in the order named, which, as has been said, ran at right angles to one of the walls of "No. 7 Room." While the current of air was not forced directly into "No. 4 Room," its passage across the front or entrance of that room was supposed to produce adequate ventilation therein. The record shows that this is the usual method of ventilating rooms of shallow depth.

But the evidence on behalf of the administratrix further shows that for some unexplained reason the ventilation in "No. 4 Room" was not sufficient and that bad air and gases accumulated therein. Taylor, who had worked in this room for a number of days in July, 1941, testified that the ventilation was bad, that he suffered severe headaches while working there, that he complained of this to the section foreman who promised to have the situation corrected, but that this was not done, and as a result he (Taylor) refused to work there longer. His place in this room was taken by Aistrop who worked there until the latter's death. The testimony of Taylor is corroborated by that of two other miners, Smith and Cox, who worked in adjacent rooms. They testified that they had likewise complained of the poor ventilation to the foreman, had been promised relief, but that none had been furnished.

It is true that this evidence is contradicted by that of witnesses for the Coal Company, who insisted that the ventilation was proper, that ample fresh air was furnished, and that no complaints had been made of improper or bad ventilation in this area. The verdict of the jury has, of course, settled this conflict in favor of the administratrix. In our opinion there is ample evidence to support this finding.

The record shows that Aistrop was employed on a day shift, working from about 7:30 a. m. to 2:30 p. m. During

the preceding night other employees of the Coal Company would blast from the seam in this and other rooms, by means of powder or other explosives, a sufficient quantity of coal to occupy the loader during the coming shift. Due to cracks or fissures in the stratum of rock underlying the coal in "No. 4 Room," it was necessary to use an unusual quantity of high explosive there. It is uncontroverted that such a blast generated a high percentage of carbon monoxide, which is commonly recognized by those engaged in the mining industry as being extremely dangerous to human beings. See also, Encyclopaedia Britannica, 14th Ed., Vol. 4, p. 846.

Edens, who "shot" or blasted coal on the early morning of the day on which Aistrop died, testified that he was compelled to use nine sticks of gengel, a low grade of dynamite, in order to dislodge the coal on that particular occasion. He also testified that the smoke then generated "seemed to be a little lazy," and was not carried off promptly by the passing ventilation.

On August 8, Aistrop went to work in this room at the usual time, about 7:30 a. m. He was last seen alive about 1:45 p. m. by two coal loaders working in adjacent rooms. His body was found beside the partly loaded car about 5:30 p. m., and according to the physician for the Coal Company he had died about 3:30 p. m.

According to the section foreman and other employees of the Coal Company, who visited "No. 4 Room" shortly after Aistrop's body was discovered, they suffered no ill effects which caused them to suspect that his death had been caused by exposure to poisonous gas. But for some unexplained reason, samples of the air were not taken, nor was the current of air tested by available meters, until the next day. While these tests showed that the air was sufficient both in quality and quantity, they throw little light on the condition prevailing on the preceding day.

When Mrs. Aistrop was notified of her husband's death she was told by Dr. Grisby, a company physician, that an autopsy would probably disclose the cause, and was asked

whether she desired such an examination. She stated that she did and gave a written authorization for an autopsy. Before the body was embalmed, Dr. Henderson, another company physician, discussed with Dr. Setzler, a surgeon at the local hospital, the advisability of holding the autopsy to which Mrs. Aistrop had agreed. But no such examination was held because neither physician, according to his testimony, considered himself competent to perform an autopsy. Just why a competent surgeon was not employed for this purpose is not explained.

While Dr. Henderson admitted, on cross-examination, that he knew that an examination of the decedent's blood would disclose whether death had been caused by carbon monoxide gas,* no specimen of the blood was taken or examined. His excuse was, "I did not know what kind of container it took."

At any rate, Dr. Henderson said, "we put it up to the superintendent," with the result that these vital tests were not made, and the body was turned over to an undertaker for embalming and burial.

■■ The failure of these agents of the company to procure and produce this vital evidence, which was thus made available to them, justified the inference that they at least thought it would be adverse to their principal, and feared that it would fasten upon someone the responsibility for this fatal injury.

On September 16, more than a month after the burial, at the request of the widow, the body was exhumed and an autopsy performed by Dr. Porter, a surgeon of Norton, Virginia. Dr. Porter testified that he could find no evidence of heart trouble or other organic disease which might have caused Aistrop's sudden death. He sent specimens of the vital organs to Dr. Cash, professor of pathology at the Medical School of the University of Virginia, who likewise found no evidence of organic disease.

---

*"The examination of the blood will make the diagnosis certain, since the presence of carbon monoxide haemoglobin may be readily detected by the spectroscope." Encyclopaedia Britannica, 14th Ed., Vol. 18, p. 122.

As has been said, Aistrop was about thirty-nine years of age and had been in good health all of his life except for an attack of laryngitis, which occurred some six years prior to his death, and common colds. Returning home from his work he was obliged to walk up a steep grade for a distance of about half a mile. According to his wife he made this trip daily without difficulty, which indicated that his heart was in sound condition. Beginning on Wednesday, July 30, and continuing through Thursday, August 7, on each day when he returned from work, Aistrop "seemed to be tired and all worn out" and "complained of having headaches." These are recognized symptoms of carbon monoxide poisoning. He did not work on August 5 and 6, and as a result "seemed more like himself." After his return to work on Thursday, August 7, he again appeared to be "worn out." His death occurred on the next day, Friday, August 8.

Dr. Porter testified that due to the embalming process—the extraction of the blood from the arteries and veins and the substitution therein of embalming fluid—it was impossible to say positively that Aistrop's death was due to carbon monoxide poisoning. But this physician expressed the opinion that in view of the history of the case, the absence of evidence of organic disease as disclosed by the autopsy, the description of the conditions under which Aistrop worked for the few days preceding his death, and his symptoms as described by the members of his family, it was "certainly reasonable" to deduce that his death was due to carbon monoxide poisoning.

On the whole we are of opinion that there was ample evidence to warrant the jury in finding that Aistrop's death was due to carbon monoxide which had accumulated in the place where he was required to work, and that this was proximately due to the negligence of the Coal Company in failing to properly ventilate the same.

The next assignment of error is to the action of the trial court in refusing to strike the evidence on the ground that it shows that Aistrop's death was due to an "accident arising out of and in the course of the employment," as defined by

section 2 (d) of the Workmen's Compensation Act (Michie's Code of 1942, section 1887 (2) (d) ), and that hence the jurisdiction of the subject-matter was in the Industrial Commission and not in the lower court.

This contention on the part of the Coal Company is quite inconsistent with its previous position, for although the record shows that it had the required number of employees and had fully complied with the Workmen's Compensation Act, and although it is apparent that the death of this employee arose out of and in the course of his employment, the employer company made no report to the Industrial Commission of the fatal injury, as required by section 67 (a) of the Act (Michie's Code of 1942, section 1887 (67) (a) ). This would indicate that the employer did not regard this as an industrial accident covered by the Act. So far as the record shows, not until its demurrer was filed in the present action, nine months after the death of the employee, did it claim that the matter was within the jurisdiction of the Industrial Commission. In the meantime the thirty-day limitation for the filing of a claim by Aistrop's dependents, fixed by section 23 of the Act (Michie's Code of 1942, section 1887 (23) ), had expired. Whether, under these circumstances, the Coal Company is now estopped to rely on its present defense is a question which we need not decide, for we are of opinion that on the merits its contention should not be sustained.

In the former appeal we prescribed the formula which the trial court should apply in determining whether the evidence on the merits showed that it or the Industrial Commission had jurisdiction of the subject-matter. We pointed out that if the death of the employee was "due to the gradual inhalation of poisonous gases over a considerable period", a common-law action for damages was the appropriate remedy, but that if his death was "due to the inhalation of poisonous gases at a particular time and on a particular occasion which can be fixed with reasonable certainty, the event is an 'injury by accident' " within the meaning of the Workmen's Compensation Act (181 Va., at page 294, 24 S. E. (2d), at page 549).

While the distinction between the two classes of cases is clear enough, it is frequently difficult to determine on which side of the dividing line a particular case lies. Hence, it is impossible to reconcile the reported cases on the subject.

Some of the courts take the view that a liberal interpretation of the words "injury by accident" brings cases of death or injury due to exposure to poisonous gases, chemicals, and the like, for a relatively short period, within the purview of the Workmen's Compensation Act. See *Stevenson* v. *Lee Moor Contracting Co.*, 45 N. M. 354, 115 P. (2d) 342 (exposure to carbon monoxide gas on one day followed by pneumonia on the next); *Twork* v. *Munising Paper Co.*, 275 Mich. 174, 266 N. W. 311 (exposure to poisonous gas for two successive days); *Industrial Commission* v. *Ule*, 97 Colo. 253, 48 P. (2d) 803 (intermittent exposure to spray for three successive days); *Hartford Acci., etc., Co.* v. *Jones*, 80 F. (2d) 680 (skin exposure to gasoline for three successive days); *Sullivan Min. Co.* v. *Aschenbach*, 33 F. (2d) 1 (exposure to gas fumes for "little more than a week"); *Howard & Co.* v. *McKay*, 189 Okla. 453, 117 P. (2d) 525 (inhalation of lead paint intermittently over a period of ten days); *Ramsay* v. *Sullivan Min. Co.*, 51 Idaho 366, 6 P. (2d) 856 (exposure to lead poisoning fumes for three weeks); *Ross* v. *Ross*, 184 Okla. 626, 89 P. (2d) 338 (exposure to paint fumes for four months); *McNeely* v. *Carolina Asbestos Co.*, 206 N. C. 568, 174 S. E. 509 (exposure to asbestos dust for five months).

On the other hand, death or injury due to exposure to poisonous gases and substances in the following cases was held not to be due to an "accident," and hence not compensable: *Knaup* v. *Western Coal, etc., Co.*, 342 Mo. 210, 114 S. W. (2d) 969 (exposure to poisonous fumes in a mine for six days); *Liondale Bleach, etc., Works* v. *Riker*, 85 N. J. L. 426, 89 A. 929, 4 N. C. C. A. 713 (eczema due to acid exposure for ten days); *Young* v. *Salt Lake City*, 97 Utah 123, 90 P. (2d) 174 (exposure to vaporized paint for seventeen days); *Prouse* v. *Industrial Comm.*, 69 Colo. 382, 194 P. 625 (septicemia due to two weeks' exposure to bad

air in a mine); *Echord* v. *Rush*, 124 Kan. 521, 261 P. 820 (exposure to poisonous fumes in a mine for one month and three days); *Gordon* v. *Travelers' Ins. Co.* (Tex. Civ. App.), 287 S. W. 911 (nephritis due to exposure to poisonous fumes for three and one-half months).

In the case at bar the record is not clear as to the length of time during which Aistrop was exposed to the poisonous fumes in the mine. Counsel for the Coal Company reasons that, from the quantity of coal removed by Aistrop from this room, he worked there a maximum of six days. But this is not conclusive. A loader was paid by the quantity of coal loaded and not by the hour, and "it is up to him how much he works," as the foreman said. There is testimony from which the jury might have deduced that Aistrop worked there for a much longer period of time. Taylor, a witness for the plaintiff, testified that he commenced work in "No. 4 Room" between the fifteenth and thirtieth of July, and continued there from three to five days when he quit because of bad ventilation. Aistrop was then assigned to work in the room. Since there is no evidence that any change was made in the ventilation after Taylor refused to work there longer, it is reasonable to infer that the bad ventilation which impelled Taylor to leave the place continued after Aistrop began to work there.

The testimony of the widow, and that of her sister, Mrs. Collier, shows that Aistrop showed symptoms of gas poisoning on July 30. But he may have been affected before this. Certainly, the evidence on behalf of the administratrix is that Aistrop disclosed these symptoms from July 30 through August 7, and this, too, despite the fact that he laid off from work on August 5 and 6. Hence, we cannot say, as a matter of law, that the inception or duration of Aistrop's inhalation of poisonous fumes is fixed with reasonable certainty.

Dr. Porter was of opinion that a continued exposure to carbon monoxide gas over a period of days would have lowered Aistrop's "general body resistance" and weakened his "ability to live," with the result that he would have been

unable to resist an "overwhelming dose" of this gas on the day of his death.

Whether Aistrop died as a result of the gradual inhalation of poisonous gas over a period of from eight days or more, or whether his death was caused by the sudden inhalation of a quantity of gas at the particular time and on the particular occasion of his death, was a question of fact for the jury. *General Printing Corp.* v. *Umback,* 100 Ind. App. 285, 195 N. E. 281, 284. This question the jury has resolved in favor of the administratrix and in favor of the jurisdiction of the lower court. We cannot say that the finding was wrong.

The view which we have adopted here is supported by the reasoning in *Knaup* v. *Western Coal, etc., Co., supra,* in which a common-law action for damages for personal injuries caused by exposure to poisonous gas in a mine for a period of six days was sustained.

It has been suggested that the conclusion which we have reached places a restricted and illiberal interpretation upon the words "injury by accident," and that its effect may be to deprive future meritorious claimants of the benefits of the Workmen's Compensation Act in similar cases. But the recent amendment (Acts 1944, ch. 77, p. 97) to the Workmen's Compensation Act, which extends the scope of the law to a number of "Occupational Diseases," including that of poisoning by carbon monoxide gas, largely removes the likelihood of any such undesirable result.

We find no error in the judgment complained of and it is

*Affirmed.*