COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judge Elder and
          Senior Judge Coleman
Argued at Salem, Virginia


TAYLOR HOPE WOLFE, INFANT, BY
 RONDA L. WOLFE, MOTHER AND NEXT FRIEND
                                      OPINION BY
v.   Record No. 2489-02-3         JUDGE LARRY G. ELDER
                                      MAY 20, 2003
VIRGINIA BIRTH-RELATED NEUROLOGICAL
 INJURY COMPENSATION PROGRAM


        FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

            Robert W. Mann (Young, Haskins, Mann,
            Gregory & Smith, PC, on brief), for
            appellant.

            Mahlon G. Funk, Jr. (M. Seth Ginther;
            Hirschler Fleischer, on brief), for appellee.


     Ronda L. Wolfe (Wolfe), suing as mother and next friend of

infant Taylor Hope Wolfe (claimant or Taylor), appeals from a

decision of the Workers' Compensation Commission (the

commission) concluding that Taylor is not entitled to benefits

from the Birth-Related Neurological Injury Compensation Program

(the Program) under the Birth-Related Neurological Injury

Compensation Act (the Act), Code §§ 38.2-5000 to 38.2-5021.  On

appeal, claimant contends the commission erroneously (1)

concluded she failed to prove a birth-related brain injury

caused by oxygen deprivation; (2) failed to infer the results of

umbilical cord blood gas testing, which she contends should have

been requested by the delivering physician, would have proved Taylor suffered birth-related oxygen deprivation; (3) failed to hold the Program was bound by what she alleges was a concession that she was entitled to the Code § 38.2-5008 presumption; and (4) failed to conclude the Program did not rebut the presumption because it did not establish a specific non-birth-related cause of Taylor's injury.

We hold the Program did not concede claimant's entitlement to the Code § 38.2-5008 presumption and that the evidence, absent an inference that the absent cord blood gas testing would have shown oxygen deprivation, was insufficient to prove claimant's entitlement to the Code § 38.2-5008 presumption. However, we hold that such an inference is available to a claimant under appropriate facts. Thus, we remand to the commission to determine whether those facts were present in this case and, if so, whether the evidence, including the inference, was sufficient to prove claimant's entitlement to the statutory presumption and benefits under the Act. Thus, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

## I.

## BACKGROUND

Taylor was born on January 24, 1998, at thirty-seven weeks two days of gestation. The day prior to Taylor's delivery, her mother was found to have pregnancy-induced hypertension and was

admitted to the hospital where labor was induced.  At the time of Taylor's birth, the delivering physician, Lenworth Beaver, and hospital, Danville Regional Medical Center, were participants under the Act.

Wolfe had good prenatal care and an uneventful delivery. Wolfe's amniotic sac broke spontaneously about an hour before delivery, and the amniotic fluid was clear.  There were no signs of meconium at any time during the delivery.

Hospital personnel monitored Taylor's heartbeat continuously in utero until approximately 30 minutes before delivery and at least every five minutes thereafter in accordance with the standards of the American College of Obstetricians and Gynecologists (ACOG).  The fetal heart monitor strips and subsequent auscultation or stethescopic heart monitoring were normal and gave no indication of hypoxia or fetal distress.  The records also revealed no evidence of utero-placental insufficiency or cord compression.

Dr. Beaver was present when Taylor crowned, and he delivered the eight-pound-ten-ounce baby by vacuum extraction, without incident, due to Wolfe's poor pushing ability.  At the time of delivery, Taylor was not breathing spontaneously.  At two minutes after delivery, medical personnel began ventilating Taylor by mask and bag.  At four minutes after delivery, Taylor displayed poor respiratory effort, flaccidity and tremors, and she was intubated.  She "had clonus when disturbed."

Despite the fact that Taylor was not breathing spontaneously, she was pink at delivery and pink at one, two, five and ten minutes following delivery. Her APGAR scores were 4 at one minute, 4 at five minutes, and 6 at ten minutes. Each score included the maximum of two points allowed for heart rate and color. All post-delivery arterial blood gases were within acceptable limits. At 10:20 a.m., approximately six hours after birth, Taylor was described as "pale pink." The records contain no indication that umbilical cord blood gases were measured, and a subsequent records review observed that "nurses' flow sheets and any records from the delivery M.D." are "conspicuously absent."

The day following Taylor's birth, she "developed seizure activity" that was controlled with medication.

An EEG performed within the first twenty-four hours was normal. Imaging studies showed no cystic degeneration, gray matter or other neurological abnormalities. A CT scan performed at one day of birth showed small left and right frontal lobe hemorrhages. These hemorrhages were absent on MRIs performed two days and twenty-three days after birth. Testing also revealed no evidence of multi-organ failure (cardiovascular, gastrointestinal, renal, hematologic, and pulmonary systems) in the neonatal period.

Taylor has been diagnosed with cerebral palsy. She is fed through a gastronomy tube and is unable to walk or speak.

On March 26, 2001, Wolfe submitted a claim for benefits on Taylor's behalf. The Program eventually denied the claim for benefits. The Program conceded that Taylor is permanently motorically and developmentally disabled but denied that Taylor's condition results from a birth-related neurological injury as defined in the Act.

The parties submitted evidence to the chief deputy commissioner in support of their respective positions.

Claimant relied on the records of numerous treating pediatric experts who opined that Taylor had "probable perinatal anoxic brain injury."

Neurologist Francis X. Walsh reviewed Taylor's medical records and opined to a reasonable degree of medical certainty that she "suffer[ed] an anoxic ischemic event to the brain at or about the time of delivery." Dr. Walsh admitted that "[t]he actual delivery records do not pinpoint specific evidence of anoxia having occurred at a particular time." He said, however, that the records for the half-hour period immediately prior to the delivery were "scanty" and that such a diagnosis was all that remained after the elimination of congenital, infectious and "any other explanation for the child's global developmental delay" by "two well-respected pediatric neurologists."

Dr. Richard T. Welham, a member of ACOG, also reviewed Taylor's records at her attorney's request. Dr. Welham opined in relevant part as follows:

- 5 -

> [The infant's] color was reported as good even in the face of no respiratory efforts. Unfortunately, . . . immediate postpartum umbilical cord gases were not done . . . . Without these, it is difficult if not impossible to be certain that the baby was not anoxic and acidotic at the time of delivery.

> \*    \*    \*    \*    \*    \*    \*

> . . . [W]e have a normal appearing fetal heart tracing and a very abnormal infant outcome. The only event that occurred between these two things was the delivery itself. If an immediate postpartum blood gas had been done and showed normal findings, that would be consistent with a neurological insult that could have occurred distant from the delivery itself. Without that vital piece of information, it is impossible to exclude anoxia and asphyxia as the cause of her neurologic problems.

The Program obtained an opinion from Obstetrician Daniel G. Jenkins, who originally opined, "based on minimal evidence," that Taylor "qualifie[d] for the fund." Dr. Jenkins found "[n]o evidence of negligence . . . , despite little documentation." Jenkins subsequently changed his opinion and concluded that Taylor "does not qualify for the fund." He explained as follows:

> I have re-read my review and note that I omitted prematurity as a cause of cerebral hemorrhage and cerebral palsy. I feel I may have over-reacted to lack of documentation by nurses, the M.D. (Dr. Beaver), or possibly the hospital records department. While there is little documentation, there is no evidence, however, of real or perceived intrapartum asphyxia that could have caused this profound disability.

- 6 -

> Hence, one is left with one of the causes of cerebral palsy, which is "unknown."
>
> This then changes my opinion, and I feel that this child does not qualify for the fund as I had previously stated. . . . [I]n rethinking this as well as the literature regarding cerebral palsy, I feel that this is a fairer decision than I previously rendered.

The Program also offered the opinion of Lisa R. Troyer, a physician who was board-certified in both obstetrics and gynecology and high risk obstetrics. Dr. Troyer reviewed Taylor's medical records before providing a written opinion and testifying by deposition. She did not examine Taylor or participate in her care. Dr. Troyer opined, to a reasonable degree of medical certainty, that hypoxia "sufficient to account for the neurologic injury that Taylor has" did not occur during the second stage of Wolfe's labor. She testified that any gaps in the fetal heart monitoring during labor occurred "mainly before midnight in the earlier parts of labor" and that "[t]here are lots of [fetal heart] tracings in what would appear to be the active part of labor that are well-documented and adequate" with no indication of hypoxia. When Wolfe entered the second stage of labor at 3:58 a.m., "[t]here was no evidence of fetal compromise at the time, the fetal heart tracing was reactive." Thereafter, the records indicated that fetal monitoring occurred by auscultation at 4:00, 4:05, 4:10, 4:15 and 4:20 a.m., and that intermittent fetal tracings were obtained between 4:08 and

4:12 a.m. Delivery occurred at 4:27 a.m. The delivery records contained no mention of meconium "at the end of the delivery," which would have been indicative of fetal distress.

Dr. Troyer explained ACOG standards provide that "in the absence of fetal distress or abnormal labor[,] [documented] auscultation every five minutes" constitutes sufficient monitoring. Dr. Troyer said she herself would have preferred more detailed data on fetal heart activity during the second stage of labor. However, she explained the fact that Taylor was pink rather than blue at delivery, as noted in the delivery records, "indicate[d] adequate oxygenation" "[d]uring the course of the second stage." Based on the evidence of fetal heart activity "ranging in the 120s and the 130s" "through labor and delivery" as "shown on intermittent monitoring, either by the tracing or by the nurse," and the baby's color, Dr. Troyer opined, "[I]t's unlikely that [Taylor suffered] hypoxia [during the labor and delivery] that [was severe enough to] result in the degree of neurological injury [Taylor exhibited]."

Dr. Troyer explained that "keeping the baby on [external] monitors with the [mother's] pushing" is "difficult[]." When asked whether an internal monitor should have been used after Wolfe's water broke at about 3:30 a.m., Dr. Troyer explained that because "there was no evidence of fetal distress" at that time, it was "okay to accede with an external monitor."

Dr. Troyer opined that the standard of care is that umbilical cord gas should be checked "if there is evidence of concern during the labor and [about] the oxygenation status of the baby."  She also said that "[i]f at birth there is evidence of difficulty," which she agreed there was in this case, "then it is prudent to check a cord gas to assess the oxygenation status."  She agreed that, when Taylor was born, "everybody knew there were problems immediately" and that the delivering physician should have clamped the cord and cut a segment for testing.  She also agreed that the results of cord blood testing "would have been diagnostic of whether [Taylor] had asphyxia during this period of time."  Nevertheless, after agreeing with this statement, she opined, to a reasonable degree of medical certainty, that hypoxia "sufficient to account for the neurologic injury that Taylor has" did not occur during the second stage of Wolfe's labor.

Dr. Troyer explained that under ACOG standards, four criteria must be present to support a diagnosis of birth asphyxia.  Those criteria are (1) "a cord pH less than 7.0," indicating a metabolic acidosis; (2) APGAR scores "ranging from zero to 3 at greater than five minutes of life"; (3) "neurological sequella[e] as evidenced by coma, tumor, tremors, seizures, poor tone"; and (4) multi-organ damage, that is damage to the tissues in a second body system (cardiovascular, respiratory, gastrointestinal, renal or hematologic) exhibited

- 9 -

"during the time that [the infant] is in the [neonatal intensive care unit] or in the nursery during the newborn period." Dr. Troyer testified that although cord pH results were unavailable, Taylor did not meet the multi-organ damage or APGAR score requirements necessary for a diagnosis of birth-related asphyxia.

Dr. Troyer testified that the presence of such small hemorrhages in Taylor's brain and their subsequent disappearance was "consistent with a normal neonate." The disappearance of the hemorrhages and MRIs that reflected a normal brain and brain stem were inconsistent with perinatal asphyxia/hypoxia and ACOG criteria for the diagnosis of same.

The Program also submitted the opinion of a panel of physicians comprising Dr. John W. Seeds, a neonatologist at the Medical College of Virginia (MCV), and Drs. Thomas Peng and Joseph Borzelleca, members of the obstetrics and gynecology faculty at MCV, pursuant to Code § 38.2-5008(B). The panel opined as follows:

> [T]here is no evidence in the record that supports a finding of oxygen deprivation during labor, delivery, or the resuscitation. The fetal monitor strip shows no abnormalities consistent with such a finding, the amniotic fluid was clear one hour before birth, the neonatal heart rate and the skin color were the two normal findings as early as one minute of life, and there was no evidence of multi organ failure as required by both the American College of Obstetricians and Gynecologists [(ACOG)] and the American Academy of Pediatrics [(AAP)]

- 10 -

to support a diagnosis of perinatal asphyxia. While multiple non obstetric specialists opine that perinatal anoxia is the cause of [Taylor's] injury because they find no other, that basis by itself is not accepted by either [ACOG] or [AAP].

There was no umbilical cord pH obtained. A pH less than 7.0 would have supported perinatal hypoxemia. However, lack of proof that she wasn't acidotic is not proof that she was acidotic. Therefore, we are left to interpret clinical findings of normal heart rate and normal color shortly after birth and antenatal evidence in the normal heart rate tracing that do not combine to support a finding of perinatal hypoxemia as the cause of her disabilities. While we cannot exclude a remote hypoxemic event prior to labor as the cause, this would not satisfy the statute . . . . We do not propose to know the cause of her disabilities, but absence of an alternative cause does not prove it was perinatal oxygen deprivation as defined by the statute.

. . . We cannot, from these records, conclude to a reasonable degree of medical certainty, that this child's disabilities resulted from oxygen deprivation during labor, delivery, or the immediate resuscitation.

At the hearing before the chief deputy commissioner, claimant advanced a spoliation of evidence theory. She argued the delivering physician should have obtained a cord blood gas level and that his failure to do so entitled her to a presumption that the results of such testing would have been favorable to her. The chief deputy commissioner rejected the spoliation argument on the ground that Dr. Beaver was not a party. She found persuasive the opinions from Dr. Troyer and

- 11 -

panel physician Dr. Seeds that no evidence established the infant sustained a brain injury caused by oxygen deprivation.

The commission affirmed the denial of benefits by a vote of two to one. The majority implicitly rejected the spoliation argument, noting the lack of umbilical cord blood gas testing and concluding the evidence established "that the cause of Taylor's condition is uncertain." The dissenter would have concluded the failure of the delivering physician to keep adequate delivery records and obtain cord blood gases, which she said were needed "to establish definitively the cause of Taylor's injury," entitled claimant to a presumption that the test results would have weighed in her favor. She reasoned that holding no such presumption applied because Dr. Beaver was not technically a party "would render the Act more restrictive than a civil proceeding for medical malpractice, where the obstetrician would be a party."

II.

ANALYSIS

A.

SUFFICIENCY OF EVIDENCE TO INVOKE CODE § 38.2-5008 PRESUMPTION

The Act establishes a framework to provide monetary relief to claimants who have sustained a "[b]irth-related neurological injury," which is defined as

> injury to the brain or spinal cord of an
> infant caused by the deprivation of oxygen
> or mechanical injury occurring in the course

- 12 -

of labor, delivery or resuscitation in the
immediate post-delivery period in a hospital
which renders the infant permanently
motorically disabled and (i) developmentally
disabled or (ii) for infants sufficiently
developed to be cognitively evaluated,
cognitively disabled . . . [and which]
disability cause[s] the infant to be
permanently in need of assistance in all
activities of daily living.

Code § 38.2-5001. The legislature, recognizing the difficulty
in proving when, but not whether, such an injury was sustained,
enacted a presumption to assist potential claimants in obtaining
benefits. Code § 38.2-5008(A)(1). Code § 38.2-5008(A)(1)
provides, in pertinent part, as follows:

A rebuttable presumption shall arise that
the injury alleged is a birth-related
neurological injury where it has been
demonstrated, to the satisfaction of the
Virginia Workers' Compensation Commission,
that the infant has sustained a brain or
spinal cord injury caused by oxygen
deprivation or mechanical injury, and that
the infant was thereby rendered permanently
motorically disabled and (i) developmentally
disabled or (ii) for infants sufficiently
developed to be cognitively evaluated,
cognitively disabled.

If either party disagrees with such
presumption, that party shall have the
burden of proving that the injuries alleged
are not birth-related neurological injuries
within the meaning of the chapter.

Claimant contends the presumption applied for three
reasons. First, she claims the Program conceded application of
the presumption. Second, she claims the evidence before the
commission compelled a finding that her disability resulted from

perinatal birth asphyxia.  Finally, she contends the delivering physician's failure to obtain an umbilical cord blood gas entitled her to a presumption that the results of such a test would have been favorable to her claim.  We consider each of these arguments in turn.

### 1.  "Judicial Admission" by the Program

Claimant contends the program conceded application of the Code § 38.2-5008 presumption in argument before the chief deputy commissioner and that the chief deputy erred in failing to incorporate this concession into her ruling.

We hold this argument does not support a reversal for two reasons.  First, claimant failed to raise this alleged error before the commission.  Thus, Rule 5A:18 prevents her from raising it for the first time in this Court.

Second, claimant's argument quotes the Program's statements out of context and is factually incorrect.  In the hearing before the chief deputy, counsel for the Program spent significant time outlining the Program's evidence and explaining how and why that evidence established "noncompensability [of the claim] in the sense of a nonhypoxic, nonasphy[x]ic event, nonmechanical event to a reasonable degree of medical certainty."  Further, the Program expressly argued against claimant's spoliation claim relating to evidence claimant averred would have proved oxygen deprivation.  The Program would have had no reason to advance such arguments if it had conceded

- 14 -

that claimant's injury resulted from oxygen deprivation and that the statutory presumption applied. Viewed in this context, the Program's statement, "[t]here is no dispute . . . that the statute gives a rebuttable presumption to the claimant," was not a concession that claimant's evidence was sufficient to entitle her to the presumption.

## 2. Evidence of Oxygen Deprivation Causing Injury

Before the Code § 38.2-5008 presumption that an injury is birth-related comes into play, a claimant must prove that her injury was to the brain or spinal cord and that it was caused by oxygen deprivation or mechanical injury. Here, claimant does not allege that her disability resulted from mechanical injury or injury to her spinal cord. Thus, we consider only whether the evidence, in the absence of any inferences to be drawn from a spoliation of evidence claim, was sufficient to support the commission's finding that claimant failed to prove her apparent brain injury was caused by oxygen deprivation.

"Claimant bore the burden of proving by a preponderance of the evidence that [s]he suffered an oxygen deprivation. That evidence must establish a probability of oxygen deprivation, not merely a possibility." Kidder v. Virginia Birth-Related Neurological Injury Comp. Pgm., 37 Va. App. 764, 778, 560 S.E.2d 907, 913 (2002). As with any medical question before the commission,

> "[m]edical evidence is not necessarily conclusive, but is subject to the commission's consideration and weighing." Hungerford Mech. Corp. v. Hobson, 11 Va. App. 675, 677, 401 S.E.2d 213, 214 (1991). . . . "Questions raised by conflicting medical opinions must be decided by the commission." Penley v. Island Creek Coal Co., 8 Va. App. 310, 318, 381 S.E.2d 231, 236 (1989). . . . "The fact that there is contrary evidence in the record is of no consequence if there is credible evidence to support the commission's finding." Wagner Enters., Inc. v. Brooks, 12 Va. App. 890, 894, 407 S.E.2d 32, 35 (1991).

Virginia Birth-Related Neurological Injury Comp. Pgm. v. Young, 34 Va. App. 306, 318, 541 S.E.2d 298, 304 (2001).

On this record, absent a spoliation inference, we find credible evidence to support the commission's decision. Claimant's experts opined that claimant's injury must have resulted from birth-related oxygen deprivation only because they were unable to find any other cause. However, both Dr. Troyer and the panel physicians opined that the lack of evidence suggesting another cause did not convince them that oxygen deprivation was the cause of Taylor's disability. Thus, absent application of a spoliation inference, credible evidence supported the commission's decision that claimant did not prove her injury resulted from oxygen deprivation.

### 3. Spoliation of Evidence Inference

Virginia law recognizes a spoliation or missing evidence inference, which provides that "[w]here one party has within his control material evidence and does not offer it, there is [an

- 16 -

inference] that the evidence, if it had been offered, would have been unfavorable to that party."  Charles E. Friend, The Law of Evidence in Virginia § 10-17, at 338 (5th ed. 1999); see Jacobs v. Jacobs, 218 Va. 264, 269, 237 S.E.2d 124, 127 (1977) (holding principle is an inference rather than a presumption).

> In general, a party's conduct, so far as it indicates his own belief in the weakness of his cause, may be used against him as an admission, subject of course to any explanations he may be able to make removing that significance from his conduct. . . . "[Conduct showing the] [c]onceal[ment] or destr[uction] [of] evidential material is . . . admissible; in particular the destruction (spoliation) of documents as evidence of an admission that their contents are as alleged by the opponents."  1 Greenleaf Ev. (16 Ed.), sec. 195, at 325.

Neece v. Neece, 104 Va. 343, 348, 51 S.E. 739, 740-41 (1905); see also Blue Diamond Coal Co. v. Aistrop, 183 Va. 23, 28-29, 31 S.E.2d 297, 299 (1944) (in wrongful death action where party's agents failed to procure evidence of cause of death presumed to be available through autopsy authorized by decedent's wife but not performed before embalming, allowing "inference that [agents] at least thought [autopsy results] would be adverse to their principal").

"The textbook definition of 'spoliation' is 'the intentional destruction of evidence[.'] . . .  However, spoliation issues also arise when evidence is lost, altered or cannot be produced."  Steve E. Couch, Spoliation of Evidence: Is One Man's Trashing Another Man's Treasure, 62 Tex. B.J. 242,

- 17 -

243 & n.4 (1999).  Spoliation "encompasses [conduct that is either] . . . intentional or negligent."  Karen Wells Roby & Pamela W. Carter, Spoliation:  The Case of the Missing Evidence, 47 La. B.J. 222, 222 (1999).  A spoliation inference may be applied in an existing action if, at the time the evidence was lost or destroyed, "a reasonable person in the defendant's position should have foreseen that the evidence was material to a potential civil action."  Boyd v. Travelers Ins. Co., 652 N.E.2d 267, 270-71 (Ill. 1995) (citations omitted), quoted in Robert L. Tucker, The Flexible Doctrine of Spoliation of Evidence:  Cause of Action, Defense, Evidentiary Presumption, and Discovery Sanction, 46 Def. L.J. 587, 603 (1997) (citing Boyd language as representative of cases that have considered issue).

Claimant contends she was entitled to a spoliation inference based on the failure of the delivering physician to preserve umbilical cord blood and request cord blood gas testing.  The Program responds that the delivering physician was neither a party nor an agent of a party.  Because the Program itself had no duty to see that the evidence was preserved or the testing performed, it argues that the presumption may not be applied to a proceeding under the Act.

The commission found, based in part on "missing information not in the record," that claimant failed to meet her burden of proof, thereby implicitly rejecting the argument that it should

- 18 -

infer cord blood gas testing results would have been favorable to claimant. The commission did not state the reason for its refusal to draw such an inference based on the spoliation claim. Based on the requirement of Code § 38.2-5010 that the commission's review shall be accompanied by "a statement of the findings of fact, rulings of law and other matters pertinent to the questions at issue," we conclude that, as to the issues on which the commission's majority opinion was silent, its affirmance of the chief deputy commissioner's denial of benefits constituted an adoption of the deputy's reasoning. The dissenter's express opinion--that the delivering physician should have been treated as a party for purposes of application of a spoliation of evidence inference--supports the conclusion that the majority's rejection of the inference was based on a contrary belief that the physician should not be considered a party.

We previously considered in Kidder, albeit tangentially, whether a missing evidence inference may be applied to a claimant's duty to prove injury resulting from oxygen deprivation under the Act. Kidder involved an absence of evidence of both an umbilical cord pH and fetal heart tracings from the last twenty minutes preceding the infant's birth. 37 Va. App. at 780 n.6, 560 S.E.2d at 914 n.6. There, we reasoned as follows:

> Claimant complains that his claim should not
> be denied due to a lack of objective
> evidence of fetal distress because fetal
> heart tracings and . . . blood gas readings
> which could have confirmed fetal oxygen
> deprivation were not obtained. However, the
> statutory scheme places the burden of
> proving oxygen deprivation on the claimant,
> and no evidence establishes that this lack
> of evidence resulted from negligence or
> intentional behavior on the part of any
> treating physician. Claimant concedes that
> the fetal heart monitor was disconnected to
> permit the emergency cesarean section, and
> the panel opined that [the infant's]
> "vigorous condition" at birth "may well have
> been deemed adequate to verify his immediate
> condition" without obtaining "an umbilical
> cord pH."

Id. (emphasis added).

Thus, we intimated in Kidder that a claimant would be entitled to a spoliation inference on proof that the absence of critical evidence "resulted from negligence or intentional behavior on the part of a[] treating physician." Id. Although we did not discuss the implications of the fact that a physician is not directly a party to a claim for benefits under the Act, we implicitly held that the physician need not be a party in order for his actions to be relevant in assessing a claimant's ability to meet his or her burden of proving entitlement to the Code § 38.2-5008 presumption. For the reasons that follow, we conclude our implicit holding in Kidder remains sound.

Although a delivering physician will never be a party to a "claim . . . for compensation" under the Act, Code § 38.2-5001, the Act is structured such that a delivering physician who is

- 20 -

also a participating physician under the Act is in privity with a party--the Program.

> It is generally held that privity means a mutual or successive relationship to the same rights of property, or such an identification in interest of one person with another as to represent the same legal rights; and the term "privy" where applied to a judgment or decree refers to one whose interest has been legally represented at the trial.

Patterson v. Saunders, 194 Va. 607, 613, 74 S.E.2d 204, 208 (1953). Because the Program is in privity with the physician, a nonparty, invocation of the missing evidence inference against the Program is appropriate. Cf. Bd. of Supervisors v. Southern Cross Coal Corp., 238 Va. 91, 96, 380 S.E.2d 636, 639 (1989) ("[A] surety, defending an obligee's suit on the principal's bonded obligation, stands in the principal's shoes and may assert only those defenses available to the principal. Because principal and surety are in privity, the defenses available to both may be asserted by either." (Citation omitted)).

The Act expressly provides that, with certain exceptions not relevant here, "the rights and remedies herein granted . . . shall exclude all other rights and remedies of such infant, his personal representative, parents, dependents, or next of kin, at common law or otherwise arising out of or related to a medical malpractice claim with respect to [a birth-related neurological] injury." Code § 38.2-5002(B). The immunity from suit provided

by the Act applies to all participating physicians.[1]  Code § 38.2-5001.  Participating physicians are licensed Virginia obstetricians who, inter alia, paid to the Program the annual assessment required by the Act and "had in force an agreement . . . whereby the physician agreed to submit to review by the Board of Medicine" if the Board "determines that there is reason to believe that the alleged injury resulted from, or was aggravated by, substandard care on the part of the physician." Code §§ 38.2-5001, -5004(B).  Thus, by virtue of the provisions of the Act, the payment of an assessment to the Program, and the existence of an agreement between the physician and the related licensing arm of the Commonwealth, the Program is in privity with the participating physician against whom a particular claim is filed.

A ruling that would not allow the Program to be held responsible for a participating physician's failure to secure important evidence would provide a physician with little incentive to obtain or preserve evidence critical to an injured party's ability to prove her claim under the Act.  But for the Act, the physician would have such an incentive because a claimant could sue the physician directly and the physician would be a party against whom the claimant could assert the right to a missing evidence inference under appropriate facts.

_____

[1] Physicians who choose not to participate in the Program have no immunity from suit.

- 22 -

Applying such an inference to the Program encourages the Program to address the issue with its participating physicians, either routinely as a part of its agreement with each participating physician or at least episodically by requesting Board review of a participating physician who has negligently or intentionally failed to secure important evidence in a particular case. Thus, allowing application of such an inference to the Program should lessen the incentive a negligent physician might have to fail to preserve relevant evidence. As the dissenting commissioner observed, a claimant's burden of proof under the Act should be no greater than it would have been at common law. Depriving a claimant of the inference that missing evidence would have been favorable to him would have just such a result.

Thus, we remand to the commission to make the factual findings necessary to determine whether the missing evidence inference should apply and, if so, whether the evidence, including the inference, entitles claimant to benefits. We note that Dr. Troyer's testimony, depending on how it is viewed by the commission, could support a finding that Dr. Beaver was negligent in failing to preserve umbilical cord blood for cord blood gas testing. Further, even if the inference applies, it is up to the commission to determine whether the lack of evidence of two of the four criteria required by the ACOG for a finding of birth-related asphyxia precludes a finding of

birth-related asphyxia even with a presumed cord pH of less than 7.0.

### III.

For these reasons, we hold the Program did not concede claimant's entitlement to the Code § 38.2-5008 presumption and that the evidence, without an inference that the absent cord blood gas testing would have shown oxygen deprivation, was insufficient to prove claimant's entitlement to the Code § 38.2-5008 presumption.  However, we hold that such an inference is available to a claimant under appropriate facts. Thus, we remand to the commission to determine whether those facts were present in this case and, if so, whether the evidence, including the inference, was sufficient to prove claimant's entitlement to the statutory presumption and benefits under the Act.

<u>Affirmed in part, reversed in part, and remanded.</u>