# CIRCUIT COURT OF ALLEGHANY COUNTY

Hammond-Mitchell, Inc.

   v.

Construction Materials Co., Inc.,
d/b/a ConRock

April 28, 2008

Case No. CL05000082-00

BY JUDGE MALFOURD W. TRUMBO

   Hammond-Mitchell, Inc. (hereinafter referred to as "HMI") contracted with Construction Materials Company (hereinafter referred to as "ConRock"), to supply HMI with 16 yards of 4000 psi for a bridge's foundation at MeadWestvaco. The concrete was delivered as ordered, December 23, 2004. After performing a "slump" test on arrival, HMI took "cores" (samples) from the concrete and had the cores independently tested to verify that the concrete met the 4000 psi specifications. The cylinders were tested at 22, 28, 34, and 56 days; none of the tests consistently confirmed the contracted 4000 psi strength. HMI notified ConRock of the problem on January 31, 2005. On February 4, 2005, HMI informed MeadWestvaco of the deficient concrete testing at 28 days and MeadWestvaco instructed HMI to demolish and replace the concrete foundation. On February 17, 2005, the cores still tested below the 4000 psi.

   On September 5, 2005, HMI filed suit to recover $40,483.42 in damages, $20,251.00 in labor, $10,090.00 in equipment, and $4,160.55 in materials. HMI alleges that ConRock is responsible under breach of contract for failure to provide 4000 psi concrete and breach of warranty either express or implied.

On October 4, 2005, ConRock filed a Demurrer and Motion Objecting to Venue. Both parties briefed the issues and a hearing was held on May 25, 2006. By order entered on June 9, 2006, the Court overruled Defendant's Motion to transfer venue and took Defendant's Demurrer under advisement, allowing Plaintiff twenty-one days to file an amended complaint, if it chose to do so. On June 9, 2006, Plaintiff filed an amended complaint.

Another hearing was held on November 9, 2006, with ConRock renewing its Motion to transfer venue and demurring to HMI's amended complaint. By Order entered on December 5, 2006, the court again overruled ConRock's motion to transfer venue as well as overruling its demurrer, being of the opinion that the allegations in the amended complaint covered issues of fact which should be decided by the trier of fact. ConRock was given twenty-one days in which to file responsive pleadings, which were filed on December 21, 2006. Said responsive pleadings included (1) a motion to strike Counts II and IV for failing to seek any relief, (2) a demurrer to Counts III and IV as neither stated any grounds for relief, (3) a plea craving oyer for the alleged contract, (4) an answer to the amended complaint, and (5) affirmative defenses. A scheduling order was entered by the court on April 23, 2007.

On April 20, 2007, ConRock filed a motion to dismiss etc., raising the issue of spoliation. This motion requested a dismissal with prejudice or, in the alternative, certain evidence be excluded. Subsequently, on October 5, 2007, HMI moved to compel a view of ConRock's premises and supplemental depositions. A hearing was held on October 9, 2007, and, on October 25, 2007, the court entered an order (1) dismissing ConRock's motion to dismiss on the grounds of spoliation of evidence, (2) overruling, at that time, HMI's motion to compel a view, and (3) granting HMI's motion to compel re-deposition of two witnesses.

Pursuant to the scheduling order, a trial was held on October 24 and 25, 2007. Upon agreement of the parties, the trial was heard without a jury and, because of the volume of evidence, was extended to October 29, 2007. Upon the completion of the evidence, the court requested that the parties submit their arguments in writing in lieu of in-court summations.

*Analysis*

*Breach of Contract*

Based on both the evidence reports and the deposition testimony of Defendant's own concrete manager, Michael Dabbs, the Court finds beyond a preponderance of the evidence that ConRock did not provide 4000 psi

concrete to the MeadWestvaco utility bridge project on December 23, 2004. There is no question that all parties knew that the project in question required 4000 psi concrete. The real question is how do the parties and, at trial, the trier of fact determine if the requirements have been met. Michael Dabbs testified regarding the mix ingredients to be used for a (Mead)Westvaco project, "Westvaco does a 4,000 psi concrete straight cement as they use that for . . . whatever they do. That is what I send unless they specify they want something different." (Dabbs 10/29/07, 8.) Further, "For this particular mix, this mix was given to ConRock by the Westvaco engineering department." (Dabbs 10/28/07, 9.) Mr. Dabbs estimated the date MeadWestvaco provided ConRock the design mix to be "roughly 2000, 2001." (Dabbs 10/29/07, 10.)

When asked if (Mead)Westvaco would require their mixes to be VDOT acceptable, Mr. Dabbs made it clear, "No . . . in our line of work there are three lines. It is the way the homeowner does it, it is the way VDOT does it, and it is the way Westvaco does it, and Westvaco recognizes nobody but the way they want it done." (Dabbs 10/29/07, 28.) "It is just the way it is. I mean I have heard it from contractors, I have heard it in a round about way through the Westvaco engineering department." (Dabbs 10/29/07, 28.) "I have dealt with them for 25 years, and I know how they deal." (Dabbs 10/29/07, 29.)

Mr. Sibold, of HMI, verified Mr. Dabbs testimony by relating it to the pour in question: "then we got a 32 day break [core sample] . . . 30 something . . . when I received that I told Mike that we were going to have to talk to Westvaco and see what we could do, because we had had some low breaks, not that low, and BE&K had okayed it, and so I wanted to get back with them before we did anything else." (Sibold 10/24/07, 11.) Sibold continued that Dabbs responded, "well, let me know what you are going to do, what happens." (Sibold 10/24/07, 12.) Sibold continued, "I told him I was going to talk to Westvaco and let them get with the engineering to see what they wanted to do." (Sibold, 10/24/07, 12.) In response to his notifying MeadWestvaco of the situation, Sibold "called him [Russell of HMI] and told him we had to gear up, we had to take the concrete out, and we were behind schedule and they want us to work over the weekend to get it out. I called people in. I called Mike at the concrete plant." (Sibold, 10/24/07, 16.) After delivering samples to F & R, Sibold continued, "At that point, when they ran the results, they sent them back to me, then I reported to Westvaco, and then I started to dig concrete out." (Sibold 10/24/07, 17.)

HMI contracted with ConRock to provide 4000 psi concrete to meet the specifications of a contract HMI had with MeadWestvaco. Through the course of many years of dealing with the ultimate consumer, MeadWestvaco, both parties know that it, MeadWestvaco, would make the final determination as to

whether the product met their specifications. The evidence through the trial, only a portion of which has been recited, shows that, if MeadWestvaco determined that the concrete was not provided per the contract, it was not.

The issue then focused on who was responsible for the non-compliant concrete. HMI provided the testing results that lead to bearing their initial burden of showing the concrete to be defective. ConRock, in response, questioned the tests, their outcome, and procedures. They further presented evidence that they had provided the appropriate mix design as required by MeadWestvaco. Without reciting the briefs provided by counsel to either party, the court holds that HMI met its burden on that issue. ConRock has provided alternative scenarios for each of its points; however, it becomes apparent that the trier of fact must speculate in each of these occurrences to find for ConRock. Furthermore, the procedures used by HMI were those in their standard course of conduct pertaining to this type of pour. There was no evidence of any other pours that were defective using these procedures.

Pertaining to this specific pour, Mr. Dabbs went to great lengths to explain how the computer at ConRock would provide the appropriate batch each time. However, on the pour in question, in his response to direct questioning, Mr. Dabbs testified that part of the batch was done by a manual override (Dabbs, 10/24/07, 52); but he could not explain why (Dabbs, 10/29/07, 53). In addition, times that were reflected on the batch ticket did not match any pertinent delivery. Mr. Dabbs testified that his employee, Mr. Martin, delivered the subject concrete at 8:42 to the job site and ticket was generated at 8:28. (Dabbs, 10/24/07, 86.) Later he testified that the only reason he could think of would be that the clock on the computer did not match the clock in the office. (Dabbs, 10/29/07, 58.) On redirect he explained the deviation by providing time to get to the office after loading and before delivery. (Dabbs, 10/29/07, 62.)

The defense has provided no further evidence that the concrete mix was supplied beyond the fact that they were supposed to be providing that mixture for all MeadWestvaco projects since 2000. Ironically, ConRock destroys concrete batching records approximately thirty days after the batch is made according to their business practices. (Dabbs, 10/29/07, 59.)

## Spoliation

ConRock alleges that there is a "spoliation" issue that should resolve the faulty concrete question in their favor. *Wolfe v. Virginia Birth-Related Neurological Injury Compensation Program*, 40 Va. App. 565, 581, 580 S.E.2d 467 (2003), held that a spoliation inference may be applied in an

existing action if, at the time the evidence was lost or destroyed, "a reasonable person in the defendant's position should have foreseen that the evidence was material to a potential civil action." In the present case, ConRock, after being notified of the samples' location and accessibility, did not take steps to ensure the concrete was tested or preserved. ConRock was on notice that a suit might be filed if the parties did not settle since February 17, 2005. This suit was filed September 12, 2005, and the defense made no effort to recover the cores despite notification until August 14, 2007.

Further, ConRock was aware of the demolition and supplied the replacement concrete. ConRock knew of the problems and could avail themselves of samples of the demolished concrete. Defendant's motion to dismiss due to spoliation is again denied.

### *Warranty of Merchantability and Limited Liability*

Defendant argues that its merchantability and liability disclaimer are sufficient to limit HMI's recovery. The warranty and limitation of liability language, located on the reverse side of the delivery ticket, at issue in this case states:

> *Warranty.* Seller agrees to replace, FOB its plant, item for item any defective items sold on this invoice. PURCHASER ACCEPTS THIS WARRANTY IN LIEU OF ANY OTHER WARRANTY, EXPRESS OR IMPLIED, INCLUDING THE WARRANTY OF MERCHANTABILITY. Seller's liability shall in no case exceed the amount which customer was invoiced for said items.

(P's Ex. B.)

HMI relies on *Bowdoin v. Showell Growers, Inc.*, 817 F.2d 1543, 1548 (1987), which holds that the manufacturers did not effectively disclaim the implied warranties of fitness and merchantability by including the disclaimer with the instruction manual that accompanied the equipment when it was delivered to purchaser. Said disclaimer did not offer the purchaser the opportunity to return the product if the purchaser did not wish to accept the disclaimer's terms. (*Id.* at 1546.) If a disclaimer was conspicuous to the purchaser *before the sale*, it will be effective based on the disclaimer's forming a part of the basis of the bargain.

This "basis of the bargain" rule protects purchasers from unexpected and coercive disclaimers. In *Showell*, the instruction manual accompanying the first spray rig contained a disclaimer of implied warranties, which

appeared to be identical to the one accompanying the spray rig in question. (*Showell* at 1544.) From this, FMC argued that Showell was on notice that FMC was disclaiming the implied warranties with respect to the second spray rig. (*Id.* at 1545.) It was noted, however, that "this is not a case where the prior dealings between the parties established a course of conduct under which it was clear to Showell that FMC made a practice of disclaiming implied warranties. (*Id.*) One earlier transaction is generally insufficient to establish a course of conduct. (*Id.*)

In accordance with *Showell*, Plaintiff argues that, because the disclaimer was not a direct part of the negotiations prior to delivery, not only is the disclaimer of merchantability void, but also the limitation on the remedy because it was not a "basis of the bargain." However, this is a case "where the prior dealings between the parties established a course of conduct" under which it was clear to HMI that ConRock made a practice of disclaiming implied warranties due to the hundreds of similar transactions that have taken place over recent years between the parties.

Plaintiff alternatively submits that the "limitation of liability" clause is ineffectual on similar grounds, that it was never part of the "basis of the bargain." In construction contracts, limiting language is not unusual. *Flintkote Co. v. W. W. Willkinson, Inc.*, 220 Va. 564, 568, 260 S.E.2d 229 (1979), established that the conspicuous requirement of the limited warranty does not apply to liability limiting language, holding that, "[w]e adopt what we believe to be the sounder and better reasoned rule that conspicuous language is not required in a writing to create a valid limitation of remedy." The parties tried this case on the theory that the limitation of remedy was not effective unless all the parties had agreed. (*Id.* at 565.) U.C.C. § 8.2-318, Official Comment 1 further clarifies that "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is *prima facie* unconscionable but limitation of damages where the loss is commercial is not." HMI has a longstanding, *commercial* relationship with ConRock and have long known of ConRock's business practices.

Section 8.1A-303 of the Virginia Code speaks specifically to the parties' course of performance, course of dealing, and a usage of trade in any practice or method. There is no dispute that the parties had engaged in hundreds, if not thousands, of transactions using the same practices or methods utilized in this transaction. There was no evidence as to how they have reacted in prior instances of disagreement; however, § 8.1A-303(e) does provide:

the express terms of an agreement and any applicable course of performance, course of dealing, or usage of trade must be construed wherever reasonable as consistent with each other. If such a construction is unreasonable, (1) express terms prevail over course of performance, course of dealing, and usage of trade; (2) course of performance prevails over course of dealing and usage of trade; and (3) course of dealing prevails over usage of trade.

The facts surrounding this dispute denote an oral contract with payment on account between two businesses dealing with each other over a period of years and hundreds of transactions.

Nether party made any indication of prior disagreement between the parties. The use of language in the delivery tickets during their course of dealings and an internal credit application dated February 20, 1997, are not in dispute. HMI contends they were never aware of the limitation language and would not have entered into such an arrangement. This position is asserted even though its secretary/treasurer in charge of payroll, accounts payable, and accounts receivable reviews the invoices for appropriateness and eventually gives them to the president, or his designee, to review along with checks for payment. (Ayers, 10/29/07, 99-103.) Since the invoices with the subject language have passed through both parties on hundreds of occasions with no objection, it must have been perceived as being reasonable. If one were now to consider it unreasonable, express terms prevail over courses of performance and dealing and usage of trade.

In *Brown v. Range Rover of North America, Inc.*, 33 Va. Cir. 104, 104 (1993), the disclaimer at issue was located in two separate, indented paragraphs near the bottom of the reverse page and printed in larger, contrasting, and italicized type. The notice to the buyer on the front side of the document, alerting him to additional terms and conditions affecting the sale on the reverse side, together with the location size, style and color of type used to print the disclaimer, made the disclaimer readily distinguishable. (*Id.*) On the back of the signed sales contract, the disclaimer was printed in capital letters: "DEALER HEREBY EXPRESSLY DISCLAIMS ALL WARRANTIES, EITHER EXPRESS OR IMPLIED, INCLUDING ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE." (*Id.*) The court held that these characteristics were sufficient to make the disclaimer conspicuous, consistent with the requirements of Va. Code § 8.2-316(2). (*Id.*)

ConRock used the correct differentiating type, all capitals on the reverse side of the delivery receipt which was referred to on the front of the ticket thus mirroring facts closely in *Brown.* Moreover, the initial credit application, negotiated between HMI and ConRock on February 20, 1997, contained the language, "credit and delivery of goods shall be subject to approval of seller who reserves the right to alter the terms and credit limit as seller deems appropriate." (D. Ex. B.) This document was clearly signed by Richard Ayers, HMI's accounts payable contact. (D. Ex. B.) There is no evidence that these documents were void because they subjected HMI to ConRock's terms of sale for being unconscionable. Plaintiff's counsel argues such a limitation would be unconscionable if the failure of the concrete were to result in a large loss of life or property damage. Were that the case, the cause of action would be in tort and not contract, as here.

Even if it were agreed that the words limiting liability or the parties' course of conduct bind the parties, does not § 8.2-719(2) address the time where a limited remedy fails in its essential purpose, here, in providing 4000 psi concrete? If so, would not these circumstances avail themselves to any remedy provided in the U.C.C.? Official Comment 1 states that "where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provision of this Article." Here, once again, the parties' prior course of dealings negates the argument that this limitation of liability is unfair and unreasonable.

However, Virginia has concluded, "that the consequential damages disclosure . . . should be treated as an independent contractual provision, valid unless unconscionable." *Envirotech Corp. v. Halco Engineering, Inc.,* 234 Va. 583, 593, 364 S.E.2d 215 (1988). Addressing § 8.2-719(3), the *Envirotech* Court noted that subsection provides "Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." (*Id.* at 592.) It further cites Official Comment 3 by noting, "actually such terms are merely an allocation of unknown or undeterminable risks." (*Id.* at 593.) "Also, unconscionability deals primarily with a grossly unequal bargaining power at the time the contract is formed . . . while failure of essential purpose relates to circumstances arising during performing of the agreement. In addition and from a practical standpoint, where, as here, experienced parties agree to allocate unknown or undeterminable risks, they should be held to their bargain; courts, or juries, should not be permitted to rewrite the agreement." (*Id.* at 593.)

*Conclusion*

ConRock delivered less than 4000 psi concrete to HMI. However, the language limiting ConRock's warranty was conspicuous. The language limiting their liability was not unconscionable. These facts, combined with the parties' course of dealings, are effective to limit liability to the cost of replacement concrete. HMI is awarded a judgment against ConRock for the sum of $1,402.80.