# CIRCUIT COURT OF AUGUSTA COUNTY

Christina Renee Dudley,
guardian and conservator,
et al.

    v.

Jim John Cash et al.

    v.

Matthew Payne

March 25, 2010

Case No. CL08000443-00

By Judge Victor V. Ludwig

This case involves a motor vehicle accident, which occurred on March 21, 2006. There was a collision between an automobile, driven by Matthew Payne, and a tractor trailer, owned by North & South Truck Lines, Inc. (North & South). Payne died in December 2008. Amanda Dudley (Dudley), the mother of two of Payne's children and a passenger in the vehicle driven by him, was injured. As a result of her injuries, Dudley was rendered incapacitated, and the Court has appointed a guardian and conservator for her. The collision occurred when Payne struck the tractor trailer in the rear while traveling on the Interstate. At the time, as evidenced by subsequent convictions, Payne was driving recklessly and without an operator's permit.

On March 19, 2008, Dudley, through her guardian and conservator, filed suit against (a) North & South, (b) Jim John Cash, the driver of the tractor trailer, (c) Roy Wayne Southers, an employee of North & South who was assigned to ride with Cash, and (d) Utility Trailer Co., Inc. (Utility), the manufacturer of the trailer which Payne struck. North & South, Cash, and Southers filed a third-party action against Payne for indemnification and contribution and to recover for property damage. They have since moved to file an amended motion to join Howard and Lugene Payne, Payne's parents, as third-party defendants on a theory of negligent entrustment.

On February 4, 2009, the parties argued the defendants' demurrers and a motion to approve a compromise settlement. At the end of that hearing, Mr. James Dungan was to file a brief within ten days (and did so on February 12), and Mr. Graves was to respond ten days later (and did so on February 24). In addition, because the plaintiff had filed three motions on February 3, Mr. Graves was to submit a brief on those matters (and did so on February 17). One motion was an objection to North & South's assertion of a privilege log, one was a motion to strike the answers and affirmative defenses of North & South, and one was a motion to compel discovery regarding tangible evidence.

On June 9, 2009, the most recent hearing, the new issues before the Court were Dudley's:

1. Motion to compel discovery from North & South;

2. Motion to compel discovery from North & South pursuant to its request for inspection of tangible evidence;

3. Objection to North & South's withholding of documents under its assertion of the use of a privilege log;

4. Motion to strike the answer and evidence of North & South; and

5. Motion to compel discovery from Utility.

The last matter was deferred because Mr. Dungan said that, on the Friday prior to June 28, he had received information from Utility, which he had not yet had an opportunity to review.

Initially at that hearing, I apologetically announced my (what I thought to be belated) conclusions with respect to all but one of the issues raised at the hearing on February 4 and that I was prepared to rule favorably on the amended motion for approval of the compromise settlement filed on behalf of Payne's estate. The latter comment elicited from Mr. Beck a request that I not approve the settlement because his client, which had filed nothing to pursue any claim during the period between February and July, decided that it wanted to file a third-party action against Payne's parents, the owners of the vehicle he was driving and the persons who entrusted it to him. Mr. Graves noted that his client had already filed a third-party complaint against Payne's estate, but the issue of any party's joining Payne's parents was first raised at the July hearing.

Although (to my recollection) the other defendants did not join in the discussion on July 9 (perhaps on a theory that it was not the time to do so or perhaps recognizing it did not seem prudent to do so), within days of that hearing, there was a flurry of activity. Mr. Dungan wrote by letter of July 10, and he appeared to suggest that the compromise could be effected without releasing Payne's parents. In his letter, Mr. Dungan acknowledged that there might be a recovery against Payne's parents for negligent entrustment on an action for contribution brought by Utility, but he asserted that "such an action and such potential recovery for Utility are separate from the instant action. . . ." Of course, if the parents were released from liability, any recovery in contribution would be lost, which was Mr. Beck's point. Also by letter of July 10, an attorney in Mr. Graves' firm sent a motion to amend the third-party complaint filed by North & South to include a claim of negligent entrustment against Payne's parents. By letter of even date, Mr. Graves wrote to state that he had had inadequate time to respond to Mr. Dungan's letter, but, by letter of July 13, he wrote to argue against approval of the compromise settlement and asked that his client be permitted to file a third-party action against Payne's parents, which motion had already been submitted under letter of July 10. By letter of July 13, Mr. Botkins wrote to observe that Mr. Dungan's letter of July 10 appeared to suggest that the compromise be approved without releasing Payne's parents and to confirm that it was his client's position that the compromise settlement was premised on their being released. By letter of July 14, Mr. Beck reiterated his arguments of July 9 and represented that he sent a motion for leave to file a third-party complaint (but which was not attached to his letter).

There, until recently, the matter ended. Neither of the filed or unfiled motions to add the Paynes as parties have been put on the docket, and, of course, I have been remiss in responding to the issues before the Court. To some extent, I wanted to wait to be sure that nothing else was going to arise so that I did not encounter the situation presented to me on July 9. I hope

everyone has filed everything that needs to be filed, and I apologize for being so long in responding.

## I. *The Amended Motion for Approval of the Compromise Settlement (The Motion)*

On October 16, 2008, Mr. Botkins filed a motion on behalf of Payne's estate, to approve a compromise settlement negotiated between the conservators of Amanda Dudley and the estate of Matthew Payne, which motion Mr. Botkins amended by a second motion filed on January 23, 2009 (the Amended Motion). The Amended Motion comes before the Court pursuant to Va. Code § 8.01-424, authorizing court approval of compromise settlements negotiated on behalf of persons under a disability. Presumably, the motion is pursuant to Paragraph B because Paragraph A refers to the court's having the "power to approve and confirm a compromise of the matters in controversy" "[i]n any action or suit wherein a person under a disability is a party." There is no action or suit against Payne's estate in which Dudley is a party. Paragraph B, however, does not require that there be a pending action.

The Amended Motion avers that Rockingham Casualty Company (Rockingham)[1] has agreed to pay, on its own behalf and on behalf of the estate of Matthew Payne, its policy limit of $100,000.00 in exchange for "full discharge of any and all claims which could be asserted by or on behalf of Amanda Dudley against Matthew Payne, the Estate of Matthew Payne, Howard Payne, Lugene Payne [collectively, Payne's Estate], and Rockingham Casualty Company as a result of the March 21, 2006, motor vehicle accident." Amended Motion, paragraph 7. The conservators have agreed to accept that payment in full settlement of claims against Payne's Estate. Amended Motion, paragraph 8. Presumably, that decision takes into account Mr. Beck's suggestion that there could be other defendants in the case, Payne's parents, against whom a claim, if successful, could result in a second recovery under the policy pursuant to Va. Code § 38.2-2204, specifically through that proviso which apparently was the legislative response to *Johnson v. Windsor Ins. Co.*, 268 Va. 196, 597 S.E.2d 31 (2004). The strength of Mr. Beck's suggestion, though, depends on a detail of coverage as to which the Court is ignorant, specifically what the per person and per accident or occurrence limits are. That appears to be a release or covenant not to sue, which, if it qualifies under Va. Code § 8.01-35.1, would have the effect of insulating Payne's Estate "from all liability for contribution to any other person liable for the same injury to" Dudley arising from the accident. At the same time, of course, any payment

---

[1]    Rockingham is the insurer of the vehicle which Payne was driving on the night of the accident.

pursuant to the compromise agreement would reduce the recovery, if any, against the defendants in the pending suit.

But for the observation at the end of this section, the Court would grant items (i) through (v) of the Amended Motion, releasing all claims by Amanda against Payne, his parents, and Rockingham, but would not grant item (vi) to dismiss a third-party claim against Payne's estate.[2] Given that the Court has no authority, however, to revise the proposed settlement or the Amended Motion or to award relief other than that requested, at this stage, the Court cannot take dispositive action on the matter.

The proposed settlement at issue in this case has been negotiated by the duly qualified fiduciaries of Dudley, and it provides Dudley with a payment equal to the coverage limit of the Rockingham insurance policy. Mr. Botkins has proffered that Payne's estate has no other insurance or other assets from which to satisfy Dudley's claims. Mr. Botkins also represented that the agreement was negotiated prior to the running of the statute of limitations on Dudley's claim against Payne, who was still alive when the statute ran; although, without my having researched the issue, it seems to me that the statute may have been tolled because of Dudley's disability.

Although the motion does not state that Rockingham's offer is conditioned on anything other than the terms to which Dudley has agreed, the release of Payne's Estate as contemplated by Va. Code § 8.01-35.1, in addition to asking that the Court enter an order approving the compromise settlement and releasing Payne's Estate from liability to Dudley, it also asks that the Court dismiss with prejudice the claims asserted in the third-party complaint, presumably including Count II, the claim for property damage, which is an independent claim, as well as Count I, which is one for contribution if Payne and the defendants were found to be at fault.

Mr. Graves, on behalf of North & South, Cash, and Southers, argued (a) that the Court has no jurisdiction to dismiss the third-party complaint, (b) that is not fair to those defendants to approve the compromise (with the possible attendant consequences), and (c) that Rockingham and Payne's Estate have not produced any release or covenant (presumably written ones), and that the motion "provides only limited details."

Addressing the last argument first, Va. Code § 8.01-35.1, although not the model of clarity, does not appear to require that the agreement be in writing. Although the final sentence of Paragraph E yields a negative inference that, if a suit is pending, there must be a written agreement, the second sentence of that Paragraph provides: "This section shall also apply to all oral covenants not to sue and oral releases agreed to on or after July 1, 1989, provided that any cause of action affected thereby accrues on or after July 1, 1989." That sentence makes it appear that an oral covenant or release in this instance is permissible.

---

[2]     Uncapitalized, "Payne's estate" is just that, not the defined term collectively describing others as well.

With regard to Mr. Graves' second argument, he is correct. Nevertheless, it is clear and the case law confirms that the purpose of Va. Code § 8.01-35.1 is to dramatically change the common law and to facilitate settlements. As Joseph Addison taught us (in a different context), he who hesitates is lost (or at least pays a price for it).

With regard to the first argument, as a practical matter, the Amended Motion and the motion it amended probably should have been a file altogether separate from the pending suit by Dudley against North & South *et al.* While I do not believe that the posture of the motion (having been filed in the pending suit) is fatal, I also do not believe that the form of the filing makes Rockingham or Payne's administrator a party to Dudley's suit against the defendants. Hence, neither has standing to ask that the third-party complaint be dismissed, whatever may be the practical consequences of a judicial approval of the compromise.

As I noted, it would be inappropriate to grant part of the prayer requested in the Amended Motion but not all of it, because to do so would be to rewrite the compromise settlement, which the Court cannot do. To the extent that it is critical to the compromise settlement that the third-party complaint be dismissed, Rockingham and Payne's estate need to reconsider the prayer of the Amended Motion. I note that approval of a compromise settlement could have a profound impact, not necessarily on litigating the third-party claims, but on the fruits of that litigation.

The matter is further complicated by the fact that, in his letter of July 10, 2009, Mr. Dungan apparently opined that the compromise could be effected without releasing Payne's parents, a suggestion which Mr. Botkins rejected in his letter of July 13, 2009.

By motion filed on February 18, 2010, Mr. Botkins again asked the Court to grant the motion approving the settlement. That motion differs from the Amended Motion in that it does not ask that the Court dismiss the third-party complaints. I believe that matter is set on the Motions Day docket for April 6.

## II. *North & South's Demurrer to the Claim of Negligent Inspection and Maintenance*

The Court overrules North & South's demurrer to the claim for negligent maintenance and supervision.

The initial issue is one argued by Mr. Graves at the hearing on February 4, specifically whether or not North & South had a duty to Dudley to inspect and maintain the commercial vehicles that it sent onto the public highways of the Commonwealth. As Dudley observed, it is clear that North & South has a statutory duty to inspect and maintain, but that is a duty imposed and defined by the Va. Code of Federal Regulations (the CFR), which is made applicable by its own terms to commercial carriers in the

Commonwealth and through 19 VAC 30-20-80. However, the fact that North & South has a statutory obligation to inspect and maintain is not dispositive of whether it has a duty to Dudley.

Neither the federal regulations nor the Virginia regulatory scheme appears to create a duty to the public enforceable by an action in tort. 49 CFR 390.37, which is the section of Subchapter B (Federal Motor Carrier Safety Regulations) addressing violations and penalties, does not imply that the regulations create a duty in tort to third parties (or that a breach of the regulations would create a tort liability); rather, it contemplates only a punitive remedy "Any person who violates the rules set forth in this subchapter . . . may be subject to civil or criminal penalties."

In *Jones v. D'Souza*, 2007 U.S. Dist. LEXIS 66993, *23 (W.D. Va. 2007), the Court found that neither the Motor Carrier Act nor the Federal Motor Carrier Safety Regulations created a private cause of action for individuals. That holding was in the face of a statute, 49 U.S.C. § 14104[a], that apparently created a private right, but which has been construed otherwise. Nevertheless, quoting *Stewart v. Mitchell Transport*, 241 F. Supp. 2d 1216, 1221 (D. Kan. 2002), the Court held that "the legislative history gives no indication that Congress intended to expand the scope of the Motor Carrier Act to cover personal injury claims where there was no such coverage before." While I do not lightly cite federal courts interpreting the law of the Commonwealth, I will certainly defer to Judge Conrad's interpretation of federal law.

As noted by Dudley, in the Commonwealth, Va. Code § 52-8.4:2 makes a violation of the regulations a traffic offense. Generally, traffic laws do not create a duty in tort, although a violation of them certainly is (or can be) evidence of the breach of a duty, provided that the duty is already grounded either in common law tort concepts or specifically by statute.

In his oral presentation, Mr. Graves argued that there are no cases in Virginia addressing a duty to inspect or maintain a motor vehicle. There is one, and that is the case of *Harris v. Duane*, 11 Va. Cir. 362 (1971), a case that might pass unnoticed but for the fact that it was decided by Judge (ultimately Justice) Compton. In that case, Duane, the owner of the vehicle, permitted his daughter, Jane, to operate it, knowing (or charged with the knowledge) that the car had defective brakes. Unknown to Duane, Jane permitted Harris to operate the automobile in which Harris was injured as a result of the defective equipment, and he sued Duane on a theory of negligent maintenance. The central question in the case was whether Duane was liable on such a theory. Without citing Virginia law (because there was none), Judge Compton noted:

> Generally an automobile owner who entrusts his vehicle to another with the knowledge that it is to be operated on a public highway must use ordinary care to see that the vehicle is in a

reasonably safe condition for the contemplated use. So, where a motor vehicle, which is in such a state of repair as to be a dangerous instrumentality, is permitted by the owner to be used by another, the owner may be liable for injuries caused in its operation by the latter, as where an automobile is equipped with defective brakes or steering gear.

*Id.* at 364. So that you do not infer that I overlooked it, in *Harris*, there was a statute which addressed the defect and which Judge Compton construed to have been enacted to protect the public. He may have concluded that the violation of the statute gave rise to a cause of action, but he also noted that that was "[i]n addition to the aforesaid common law duty of the bailor to a . . . person injured. . . ." *Id.* Citing a federal case, *Coop v. Williamson*, 173 F.2d 313, 315 (6th Cir. 1949), Judge Compton added:

While automobiles and motor trucks are not *per se* dangerous instrumentalities, they may become so when used at places and in a manner calculated to do injury. Hence the rule that one who lets an automobile or motor truck for use in public owes the duty of exercising ordinary care to avoid putting forth a machine with defects calculated to injure persons who come in contact with it.

*Harris*, at 365.

Although not directly on point, the case of *Atlantic Rural Exposition, Inc. v. Fagan*, 195 Va. 13, 77 S.E.2d 368 (1953), is instructive for the negative inference one draws from the Court's holding with respect to the driver and owners of a vehicle, which contributed to the plaintiff's injury. During the course of a race, a wheel of one of the race cars became detached, left the track, went into the bleachers, and struck the plaintiff, injuring him. At the conclusion of the defendant's case, the Court struck the evidence as to the driver and owners. In sustaining that ruling, the Court noted:

Before the automobile driven by Crouse entered upon the races, it was inspected and no defect found. However, after the mishap, the hub and wheel were x-rayed and examined. No defect or flaw was found in them, but there was definite evidence of a fatigue failure in the spindle. That is described as a failure in metal brought on by continuous stress and strain applied over a period of time. The danger of spindles breaking on racing cars from fatigue failure is enhanced by a bumpy or rough track, and it is not an infrequent occurrence. It is difficult to guard against and is a recognized hazard of racing.

However, there is no proof that the existing or approaching fatigue failure on the spindle of this car should or could have been discovered before the mishap. . . .

The car that they used had been subjected to reasonable inspection and was believed to be safe. . . . We find no breach of duty or negligence on their part, and no error was committed by striking the evidence and exonerating them from liability.

*Id.* at 19.

Without considering the implication of that holding for the driver, it is clear that the Court exonerated the owners of the vehicle because the vehicle had been subjected to a reasonable inspection before it was put on a track where a defective vehicle could cause injury. Because of that reasonable inspection, the Court found "no breach of duty or negligence" on the part of the owners. Perhaps more than inferentially, the duty to which the Court referred was the owners' duty to the plaintiff, a person at the racetrack who was at risk had the vehicle not been safe, and clearly, had the owners not performed the inspection, they could have been found negligent in that regard.

With respect to the objection that Dudley's complaint is insufficient as a matter of law in that it contains only "vague and generic allegations," it certainly is the case that the Second Cause of Action is spare. Memorandum in Support of Defendants' Demurrers, C.3, page 7. Still, it refers to the duty of North & South; it alleges that it was negligent in that it "failed to inspect the rear of the trailer for proper lighting and carelessly and negligently failed to maintain proper or sufficient lighting on the rear of the trailer and further carelessly and negligently failed to inspect the underride guard and negligently failed to maintain the trailer and its underride guard." Although it is short on details, Rule 3:18(b) provides that "[a]n allegation of negligence . . . is sufficient without specifying the particulars of the negligence."

The principle of the Rule has long been recognized by our Supreme Court. Again I refer to Justice Compton, who, writing for the Court in *CaterCorp, Inc. v. Catering Concepts, Inc.*, 246 Va. 22, 24, 431 S.E.2d 277 (1993), noted:

When a motion for judgment or a bill of complaint contains sufficient allegations of material facts to inform a defendant of the nature and character of the claim, it is unnecessary for the pleader to descend into statements giving details of proof in order to withstand demurrer. *Hunter v. Burroughs*, 123 Va. 113, 129, 96 S.E. 360 (1918). And, even though a motion for judgment or a bill of complaint may be imperfect, when it is drafted so that defendant cannot mistake the true nature

of the claim, the trial court should overrule the demurrer; if a defendant desires more definite information, or a more specific statement of the grounds of the claim, the defendant should request the court to order the plaintiff to file a bill of particulars.

*Alexander v. Kuykendall*, 192 Va. 8, 14-15, 63 S.E.2d 746 (1951).

### III. *North & South's Demurrer*
### *to the Claim of Negligent Hiring and Supervision*

A. *Hiring*

The Court sustains North & South's demurrers to the claims for negligent hiring with leave to amend.

Virginia has "long recognized the tort of negligent hiring." *J. v. Victory Tabernacle Baptist Church*, 236 Va. 206, 208, 372 S.E.2d 391 (1988). Unlike liability asserted under the doctrine of *respondeat superior*, "the tort of negligent hiring is a doctrine of primary liability; the employer is principally liable for placing an unfit individual in an employment situation that involves an unreasonable risk of harm to others. Negligent hiring enables a plaintiff to recover in circumstances when *respondent superior*'s `scope of employment' limitation protects employers from liability." *Interim Pers. of Cent. Va., Inc. v. Messer*, 263 Va. 435, 441, 559 S.E.2d 704 (2002).

Nevertheless, this tort involves an element of knowledge on the part of the employer. "Liability for negligent hiring is based upon an employer's failure to exercise reasonable care in placing an individual with known propensities, or propensities that should have been discovered by reasonable investigation, in an employment position in which, due to the circumstances of the employment, it should have been foreseeable that the hired individual posed a threat of injury to others." *Southeast Apartment Mgmt. v. Jackman*, 257 Va. 256, 260, 513 S.E.2d 395 (1999) (citing an earlier case). While Dudley has pleaded generally that North & South negligently hired Cash and that this action was the proximate cause of her injuries, she has not pleaded any facts regarding the element of knowledge. Plaintiff's Complaint, at 36 and 38. Dudley must "allege at least one specific fact which, if known to the defendants `would have deterred a reasonable employer'." *Doe v. Bruton Parish Church*, 42 Va. Cir. 467, 481 (1997). While the claim, properly pleaded, is cognizable, Dudley's conclusory allegations are insufficient to survive a demurrer.

B. *Supervision: North & South's Demurrer to the Claim of Negligent Supervision*

The Court sustains the demurrer of North & South to the claim for negligent supervision without leave to amend.

The Court can find no basis in Virginia law for the claim against North & South, and Dudley has not provided any persuasive authority for such a claim. Despite the employment agreement between Cash and North & South and despite the federal regulations on which Dudley relies, absent a common law duty, North & South cannot be held liable for the actions of Cash or Southers on a theory of negligent supervision.

Dudley argues that North & South had "an explicit duty to train and supervise [Cash], particularly during the eight-week training period that [North & South] required under the terms of his employment." From that, I infer that Dudley is arguing that the existence of that contract created a duty of supervision by North & South, which somehow benefited her. A contract, however, cannot create an independent duty in tort. To give rise to a cause of action in tort, "the duty tortiously or negligently breached must be a common law duty, not one existing between the parties solely by virtue of the contract." *Richmond Metro. Auth. v. McDevitt, Street, Bovis, Inc.*, 256 Va. 553, 558, 507 S.E.2d 344 (1998) (internal citations omitted). Generally, that proposition is applicable when a party asserts a claim in tort which is grounded on a contractual relationship with another. In this instance, the relationship between North & South and Dudley is remote and tenuous to the point of its being chimerical. As North & South correctly observes, Dudley "was not a party to the contract, is not a beneficiary of the contract, and contract creates no duty as to her." Defendant's Reply Memorandum in Support of Defendants Cash, Southers, and North & South's Demurrers at 3. Moreover, there is no special relationship between Dudley and North & South that would give rise to any primary duty by North & South to her resulting from its contract with Cash. See *Holles v. Sunrise Terrace, Inc.*, 257 Va. 131, 509 S.E.2d 494 (1999).

The regulations cited by Dudley do not create an independent cause of action. A statute (or inferior regulations), absent express direction from the legislature, will not create a duty in tort.

Because Dudley has no cause of action born of contract or statutory (or regulatory) law, she must look elsewhere to find support for her claim. However, with respect to a common law claim, negligent supervision is not recognized as a cause of action under Virginia law. The seminal case cited for this proposition is *Chesapeake & Potomac Tel. v. Dowdy*, 235 Va. 55, 365 S.E.2d 751 (1988). In that case, in the context of a harassment suit, the Virginia Supreme Court held, "[t]here is no duty of reasonable care imposed upon an employer in the supervision of its employees under these circumstances. . . ." *Id.* at 61. While the final three words of that sentence might indicate a significant limitation on the holding, the decision has never been revisited except to be followed. See *Thompson v. Front Royal*, 117 F.

Supp. 2d 522 (W.D. Va. 2000); *Lockney v. Vroom*, 61 Va. Cir. 359 (2003); *Jones v. D'Souza*, 2007 U.S. Dist. LEXIS 66993, 2007 WL 2688332 (W.D. Va. 2007). More directly related to the facts of the pending case, in *Jones v. D'Souza, supra*, Judge Conrad applied that proposition in the context of a case in which an injured motorist alleged that the defendant company had failed adequately to supervise its driver.

Dudley has not directed the Court's attention to (and I have not found independently) any case to suggest that this duty exists in the context of operating a motor vehicle. In fact, the case of *Nilsen v. Trigg*, 34 Va. Cir. 271 (1994), suggests the opposite. (Because the facts of *Nilson* seem more akin to Dudley's allegation of negligent supervision by Southers of Cash than to the alleged negligent supervision of North & South of Southers or Cash, I leave a more detailed description of that case until later.)

While Dudley accurately observes that the Virginia Supreme Court in *Dowdy* "did not state [that] there could never be circumstances where a duty of reasonable care in supervision would arise,"[3] I decline, under these circumstances, to expand a contested primary liability claim to expose North & South to an unprecedented theory of negligent supervision.

## IV. *Southers' Demurrer to the Claim for Negligent Supervision*

The Court sustains Southers' demurrer to the claim for negligent supervision without leave to amend.

As is the case with a similar claim against North & South, the Court can find no basis in Virginia law to support this claim against Southers, and Dudley has not provided any persuasive authority for her claim. Again, despite the employment agreement between Cash and North & South and despite the federal regulations on which Dudley relies, absent a common law duty imposed on fellow employees who are passengers (even those with contractual duties to a common employer), Southers cannot be held liable for the actions of Cash on a theory of negligent supervision.

In her Memorandum in Opposition to Demurrers, Dudley argued that "Defendant had full knowledge of an employment training contract signed by [Cash] with [North & South]." If that allegation is in the complaint, it does not create a duty by Southers to Dudley or any other third party for the reasons cited in the Court's address of the demurrer by North & South on this issue. North & South did not assume a duty toward Dudley arising from the employment agreement and therefore could not have "delegated" this duty to Southers. Southers, of course, was not a party to the agreement between Cash and North & South, and, whatever contractual arrangement Southers may have had with North & South, it did not create a duty to third parties. Any duty Southers owed in his contractual capacity was owed to

---

[3] Plaintiff's Memorandum in Opposition to Demurrers, p. 5.

North & South, and, with regard to third parties, he was a passenger in the vehicle owned by North & South.

For the reasons already recited, the regulations fail to create a duty owed by North & South to Dudley. Furthermore, they certainly do not impose an independent duty on Southers, as its employee, to her.

In *Nilsen v. Trigg*, 34 Va. Cir. 271 (1994), the plaintiff alleged that Trigg, an eighteen year old licensed driver riding with a driver whom he knew to be inexperienced and operating with only a learner's permit, failed adequately to supervise the operator by failing "to pay proper time and attention to the operation of the motor vehicle, and . . . to supervise, advise, and direct [the driver with only a learner's permit] on the proper course of conduct when faced with [the factual situation described in the case]." Although Dudley attempts to distinguish her case from *Nilson* on the basis that she has pleaded that Southers actually acted in a supervisory capacity (a distinction not entirely clear to me), the fact that he may have done so (and, for the purposes of the demurrer, the necessarily admitted fact that he did) does not create a cause of action when one does not otherwise exist.

While I recognize that *Nilsen* is not a precedent for this Court and while I recognize that the Court in that case made its finding on the basis that the applicable statute, which required a learning driver to have a licensed driver with him, did not impose a duty on the licensed (or supervisory) driver, the negative inference from that reasoning is that, absent a statutory obligation, there was no common law duty on which the plaintiff could rely. So it is in this case. Couple that with the conclusion that North & South had no common law duty to supervise (for the reasons already recited), and the conclusion is that Southers owed no common law duty to Dudley for supervision of Cash.

### V. *Southers' Demurrer to the Claim for Negligent Inspection and Maintenance*

The Court sustains Southers' demurrer to the claim for negligent inspection and maintenance without leave to amend.

Paragraph 43 of Dudley's complaint alleges that Southers "carelessly and negligently allowed the negligently inspected and maintained trailer to be driven from the North & South terminal and operated on Interstate 81." Dudley's complaint, Paragraph 43. Southers was neither an owner of the vehicle nor a driver of it. There is no allegation in the complaint that would support the proposition that Southers had any duty to inspect or maintain the vehicle.

### VI. *Dudley's Motion To Strike the Answer and Evidence of North & South*

14

Dudley's motion is predicated largely on North & South's "refusal to produce for inspection and evaluation the trailer and underride guard at issue in this action." In support of that, she asserts that:

1. North & South "knew [that] civil legal actions would result from the collision" which is the basis of this action as evidenced by e-mail correspondence from an attorney to the Commonwealth's Attorney of Augusta County, dated May 23, 2006. In fact, the e-mail to which Mr. Dungan refers merely states that the attorney's firm was "retained to defend [Cash and North & South] against any civil claims arising out of the . . . accident. . . ." That certainly does not indicate knowledge that such claims would be forthcoming, although it does indicate that North & South considered it a possibility. I know of no authority, however, that such anticipatory planning alone imposes any obligations on a potential litigant to take precautionary measures to preserve tangible evidence.

2. By letter of January 16, 2007, Mr. Dungan informed the attorneys for North & South that his firm represented Dudley, acknowledged that no litigation had been initiated, but served notice that it was "forthcoming." In that letter, Mr. Dungan stated that the letter was intended to "serve notice" on North & South, Cash, and Southers to preserve items listed on the following three pages. Again, I am unaware of any obligation that such a demand, unaccompanied by any pending litigation or discovery pursuant to the Rules, would impose on the defendants.

On March 19, 2008, Dudley filed suit, and during the course of discovery, North & South disclosed that, on September 24, 2007, six months before Dudley initiated the action, the trailer (having been repaired and put back into service[4]) was damaged in an accident. From that, Dudley argues that North & South evidenced bad faith and asks that its answer be stricken.

Mr. Dungan did not provide any authority for the proposition that there is an obligation on the part of a potential defendant involved in a motor vehicle accident to preserve the damaged vehicle (or other property) in anticipation that someone might file a lawsuit. If that proposition is correct, it is the equivalent of permitting a plaintiff, who is in control of when and whether he will assert a claim, to prevail on the claim, not because he has the evidence to prove it but because he has no evidence to prove it (no matter how speculative the claim might be) because the defendant has disposed of some evidence that might have been helpful to the Plaintiff. Nevertheless, in a different context (one in which the item lost had no utility in the defendant's business), in *Wolfe v. Virginia Birth-*

---

[4] In the memorandum opposing Dudley's motion, it appears that the "Federal Motor Carrier Regulations prohibit the use of a semi-trailer . . . without . . . a functioning ICC bumper. The ICC bumper of the trailer was repaired/replaced on March 22, 2006 . . . so that the trailer could be returned to service. . . ."

*Related Neurological Injury Comp. Program*, 40 Va. App. 565, 581, 580 S.E.2d 467 (2003), the Court of Appeals held:

> Virginia law recognizes a spoliation or missing evidence inference, which provides that "where one party has within his control material evidence and does not offer it, there is [an inference] that the evidence, if it had been offered, would have been unfavorable to that party."

*Id.* at 580-81.

However, as authority for its holding, the Court cited *Jacobs v. Jacobs*, 218 Va. 264, 237 S.E.2d 124 (1977), which, in turn, cited with approval a treatise which noted that "the rule [would not] operate against a defendant when the plaintiff has not made a prima facie case." *Id.* at 269. From that I infer that the absence of any other evidence in support of Dudley's claim for negligent maintenance or inspection would result in the inference not being applicable to save the otherwise unsupported claim.

Dudley's argument appears to assume that the sole remedy for spoliation of evidence in Virginia is an irrebuttable presumption that the missing evidence would be helpful to the plaintiff, shifting the burden to the defendant to prove that the evidence either would not be helpful to the plaintiff or that the tangible evidence was not a cause of the injury. (Only if the presumption were irrebuttable would it be appropriate to strike the defendant's evidence, without affording the defendant an opportunity to develop those issues.) However, as noted in *Wolfe* and *Jacobs, supra*, there is no presumption, irrebuttable or otherwise, but only a permissible inference. Clearly, striking the pleadings and evidence of North & South is a draconian measure which Virginia courts have not approved.

Notwithstanding the standard apparently adopted by the Court in *Wolfe*,[5] the Supreme Court has made it clear that the action of the offending party must be one taken in bad faith. In *Gentry v. Toyota Motor Corp.*, 252 Va. 30, 471 S.E.2d 485 (1996), Toyota sought to have Gentry's case dismissed because her agent, without her authorization, had damaged a part which Toyota wanted to examine. As one of two reasons for reversing the trial court's dismissal of the action, the Court held:

> Courts often impose sanctions when a litigant or his attorney has acted in bad faith. The purpose of such a sanction is to punish the offending party and deter others from acting similarly.

---

[5]     One might infer that the Court in Wolfe adopted a negligence standard. "Thus, we intimated in Kidder that a claimant would be entitled to a spoliation inference on proof that the absence of critical evidence 'resulted from negligence or intentional behavior on the part of a treating physician'." Id. at 583.

16

In the present case, the record is clear that neither the Gentrys nor their attorney acted in bad faith, and the trial court so found.

*Id.* at 34.

Under the circumstances of this case, assuming that North & South foresaw the possibility of litigation, it is unreasonable to expect that North & South would preserve a valuable asset and tool in its business as potential evidence for a possible lawsuit that might be initiated at some unspecified time in the future (presumably within the statute of limitations, if only by a day or two) or that it would not repair the asset and return it to service. Were such an obligation to be applied generally, every motor vehicle accident would result in the parties' damaged vehicles' being parked, unrepaired, and unused, until the statute of limitations would run on every possible claim (and that might be a long time in the case of an incapacitated plaintiff for whom the statute could be tolled during the period of incapacity). The consequences of the imposition of such an obligation, without recognizing business realities, could be disastrous, *e.g.*, for a small enterprise which uses its only motor vehicle for transporting goods or equipment to conduct its business, the retirement of that vehicle pending a potential plaintiff's decision to sue could mean that it simply would have to close its doors. Even with a letter similar to the one which Mr. Dungan wrote on January 16, 2007 (speaking to a suit that was "forthcoming"), the owner of the damaged vehicle would be held hostage to the timetable of the potential litigant as to when he could return the asset to service. In this instance, by the time Mr. Dungan wrote his letter, apparently the trailer had already been repaired, so any utility it might have had for Dudley's case may have been compromised.

There is no evidence that North & South acted in any way other than reasonably (and none that it was acting in bad faith); so the Court denies Dudley's motion to strike.

As noted by Mr. Graves in his memorandum in opposition to Dudley's motion to strike, to the extent that Dudley is asserting that the destruction of the trailer has any bearing on her claim against Utility, the case of *Austin v. Consolidation Coal Co.*, 256 Va. 78, 501 S.E.2d 161 (1998), is dispositive of the issue.

### VII. *Dudley's Motion To Compel Discovery from North and South, Southers, and Cash*

Dudley has filed a number of motions to compel responses to discovery, but those which were the subject of the praecipe filed on March 3, 2009, which resulted in the hearing on June 9, 2009, were:

1. A motion to compel discovery from North & South (filed on January 21, 2009);

2. A motion to compel discovery from North & South pursuant to a request for inspection of tangible evidence pursuant to Rule 4:9 of the Rules (filed on February 2, 2009);[6]

3. An objection to North & South's withholding documents under its assertion of a privilege log (filed on February 2, 2009); and

4. A motion compelling discovery from Utility (filed on March 3, 2009).

As I stated, at the beginning of the hearing, Mr. Dungan noted that Utility had delivered some responses on June 28 and that he had not yet had an opportunity to review them, so that matter was deferred. He stated that the balance of the issues went to the privilege log, and arguments on the discovery issues were largely limited to that.

In every case, matters sought to be discovered fall into three categories. Some are clearly discoverable, some are privileged (and are not discoverable), and some are work product (and are conditionally discoverable). The first two categories need little comment. Regarding the last, Rule 4:1(b)(3) provides as follows:

> Subject to the provisions of subdivision (b)(4) of this Rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this Rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of his case and that he is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

The general rule (although not one announced either by the Virginia Court of Appeals or the Virginia Supreme Court) is that the party asserting work product protection bears the burden of proof of establishing entitlement to the privilege.

---

[6] I believe that this motion was directed to the trailer and the underrail guard, neither of which are, if they still exist, in the control of North & South.

At issue are ten documents[7] identified by North & South, specifically:

1. A computer printout of the accident report (of unspecified date): Mr. Graves' position was that, if the document was prepared after March 23, it is work product. Mr. Graves argued that the privilege could apply even prior to the engagement of counsel if the criteria of *Ring v. Mikris, Inc.*, 40 Va. Cir. 528 (1996), were met. (Given that there is little precedent from our appellate courts regarding work product or privilege, Judge Frank's analysis is the best that I have seen.) In this case, however, few of those criteria have been met. To be sure, one of the occupants of Payne's vehicle was seriously injured, and it seems unlikely that the information from George Reid, with Custard Insurance Adjusters (Custard), to Cherokee Insurance (Cherokee) dealt with safety items, but none of the other criteria apply. Most importantly, one could hardly argue that it was immediately apparent that "the negligence (which was the proximate cause of the accident), if any, would likely be solely with the insurance company's insured. . . ." *Id.* at 533. Given that Mr. Graves cannot date the document (and it is his client's obligation at least to do that in order to claim that it is work product), I find that this printout was not work product and should be produced.

2. A letter dated March 22, 2006, from Reid to a representative of Cherokee Insurance, which also contained handwritten notes: For the reasons noted in item 1, I find that this letter was not work product and should be produced.

3. A fax cover sheet from North & South to Cherokee acknowledging that Custard [had been] assigned to the claim: Mr. Graves asserted that this document was in the claims file and that, if he did not assert a privilege with respect to it, he would lose the privilege as to all of the file. For the reason noted in item 1, I find that this cover sheet was not work product and should be produced.

4. A loss report completed by a representative of North & South and dated March 22, 2006: Mr. Graves asserted that this document was in the claim file and that, if he did not assert a privilege with respect to it, he would lose the privilege as to the entire file. For the reasons noted in item 1, I find that his report was not work product and should be produced.

5. Handwritten notes in Cherokee's file generated on or before March 23, 2006, "presumably authored by a representative of" Cherokee: For the reasons noted in item 1, I find that these notes are not work product and should be produced.

6. An engagement letter dated March 23, 2006, from Cherokee to Mr. Graves: This letter clearly is privileged.

---

[7] During oral argument, Mr. Dungan also referred to photographs, which had been supplied by North & South to Utility, and argued that, if those photographs were ever privileged, they lost that character when they were published to a third party. Unfortunately, I am not familiar with the photographs, I do not know if they are a part of any of the numbered items which were argued, and I cannot comment more on them.

7. A report dated March 28, 2006, from Reid to Mr. Graves: This report clearly is privileged.

8. A report dated April 26, 2006, from Reid to Mr. Graves: This report clearly is privileged.

9. A letter dated June 12, 2006, from Reid to Mr. Graves with reports from state and local law enforcement authorities: The letter clearly is privileged. The reports from state and local law enforcement authorities are not, nor are they work product, and they should be produced.

10. A letter dated June 12, 2006, from Reid to the Virginia State Police: It is difficult to conceive how that letter, published to another entity, and a public organization at that, could be privileged. Moreover, just as it is the case that some documents prepared prior to the engagement of counsel can be work product, it must be that not every document generated after the engagement of counsel must be work product. I find that this is not and that the letter should be produced.

In addition to the items above, although it was not a matter addressed by the praecipe filed on March 3, 2009 (a fact that Mr. Graves noted), Mr. Dungan referred to a motion to compel discovery from Cash (filed on January 21, 2009). Specifically, he referred to a written statement by Cash (presumably Request for Production No. 6) and to surveillance of Dudley's activities (presumably Interrogatory No. 17).

With respect to Cash's statements, the interrogatory asks for copies of "any statement that you made to any insurance companies or their agents." That is simply too broad for the Court to divine whether or not the statements were made in anticipation of litigation (hence work product). That is the objection which Cash raised, but it, also, is too broad. If Cash's statements are to be given the status of work product, it is incumbent on him to state a basis for it, not merely that it is because he says it is. Moreover, even if it is work product, that is not to say that Cash's statement might not be discoverable on a showing of another proper basis for discovery. See *Massenburg v. Hawkins*, 70 Va. Cir. 13 (2005). Accordingly, Cash must either provide a basis for finding that his statements are work product or he must produce them.

With respect to any surveillance that might have been made of Dudley, the circuit courts of the Commonwealth are of two minds, and we have no guidance from the appellate court. Without attempting to describe in detail all of the valid arguments on both sides of the issue (with divides sometimes in the same circuit), this Court holds that surveillance information is discoverable and that Cash should respond to the interrogatory.